# JOHNSON *v.* CALIFORNIA ET AL.

No. 03–636.   Argued November 2, 2004—Decided February 23, 2005

O'CONNOR, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. GINSBURG, J., filed a concurring opinion, in which SOUTER and BREYER, JJ., joined, *post*, p. 516. STEVENS, J., filed a dissenting opinion, *post*, p. 517. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 524. REHNQUIST, C. J., took no part in the decision of the case.

*Bert H. Deixler* argued the cause for petitioner. With him on the briefs were *Charles S. Sims, Lois D. Thompson,* and *Tanya L. Forsheit.*

*Acting Solicitor General Clement* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were former *Solicitor General Olson, Assistant Attorney General Acosta, David B. Salmons, David K. Flynn,* and *Tovah R. Calderon.*

*Frances T. Grunder,* Senior Assistant Attorney General of California, argued the cause for respondents. With her on the brief were *Bill Lockyer,* Attorney General, *Manuel M. Medeiros,* Solicitor General, *Robert R. Anderson,* Chief Assistant Attorney General, and *Sara Turner,* Supervising Deputy Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Elizabeth Alexander, David C. Fathi, Steven R. Shapiro, Jordan C. Budd, Alan Schlosser,* and *Mark D. Rosenbaum;* and for Former State Corrections Officials by *Michael C. Small.*

Briefs of *amici curiae* urging affirmance were filed for the State of Utah et al. by *Mark L. Shurtleff,* Attorney General of Utah, and *Gene C. Schaerr,* and by the Attorneys General for their respective States as follows: *Troy King* of Alabama, *Gregg D. Renkes* of Alaska, *M. Jane Brady* of Delaware, *Lawrence G. Wasden* of Idaho, *Brian Sandoval* of Nevada, *Kelly A. Ayotte* of New Hampshire, and *Wayne Stenehjem* of North Da-

JUSTICE O'CONNOR delivered the opinion of the Court.

The California Department of Corrections (CDC) has an unwritten policy of racially segregating prisoners in double cells in reception centers for up to 60 days each time they enter a new correctional facility. We consider whether strict scrutiny is the proper standard of review for an equal protection challenge to that policy.

I

A

CDC institutions house all new male inmates and all male inmates transferred from other state facilities in reception centers for up to 60 days upon their arrival. During that time, prison officials evaluate the inmates to determine their ultimate placement. Double-cell assignments in the reception centers are based on a number of factors, predominantly race. In fact, the CDC has admitted that the chances of an inmate being assigned a cellmate of another race are "'[p]retty close'" to zero percent. App. to Pet. for Cert. 3a. The CDC further subdivides prisoners within each racial group. Thus, Japanese-Americans are housed separately from Chinese-Americans, and northern California Hispanics are separated from southern California Hispanics.

The CDC's asserted rationale for this practice is that it is necessary to prevent violence caused by racial gangs. Brief for Respondents 1–6. It cites numerous incidents of racial violence in CDC facilities and identifies five major prison gangs in the State: Mexican Mafia, Nuestra Familia, Black Guerilla Family, Aryan Brotherhood, and Nazi Low Riders. *Id.*, at 2. The CDC also notes that prison-gang culture is violent and murderous. *Id.*, at 3. An associate warden tes-

---

kota; and for the National Association of Black Law Enforcement Officers, Inc., by *David T. Goldberg.*

*John H. Findley* filed a brief for the Pacific Legal Foundation as *amicus curiae.*

tified that if race were not considered in making initial housing assignments, she is certain there would be racial conflict in the cells and in the yard. App. 215a. Other prison officials also expressed their belief that violence and conflict would result if prisoners were not segregated. See, *e. g., id.,* at 305a–306a. The CDC claims that it must therefore segregate all inmates while it determines whether they pose a danger to others. See Brief for Respondents 29.

With the exception of the double cells in reception areas, the rest of the state prison facilities—dining areas, yards, and cells—are fully integrated. After the initial 60-day period, prisoners are allowed to choose their own cellmates. The CDC usually grants inmate requests to be housed together, unless there are security reasons for denying them.

### B

Garrison Johnson is an African-American inmate in the custody of the CDC. He has been incarcerated since 1987 and, during that time, has been housed at a number of California prison facilities. Fourth Amended Complaint 3, Record, Doc. No. 78. Upon his arrival at Folsom prison in 1987, and each time he was transferred to a new facility thereafter, Johnson was double-celled with another African-American inmate. See *ibid.*

Johnson filed a complaint *pro se* in the United States District Court for the Central District of California on February 24, 1995, alleging that the CDC's reception-center housing policy violated his right to equal protection under the Fourteenth Amendment by assigning him cellmates on the basis of his race. He alleged that, from 1987 to 1991, former CDC Director James Rowland instituted and enforced an unconstitutional policy of housing inmates according to race. Second Amended Complaint 2–4, Record, Doc. No. 21. Johnson made the same allegations against former Director James Gomez for the period from 1991 until the filing of his complaint. *Ibid.* The District Court dismissed his complaint

for failure to state a claim. The Court of Appeals for the Ninth Circuit reversed and remanded, holding that Johnson had stated a claim for racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. *Johnson* v. *California*, 207 F. 3d 650, 655 (2000).

On remand, Johnson was appointed counsel and granted leave to amend his complaint. On July 5, 2000, he filed his Fourth Amended Complaint. Record, Doc. No. 81. Johnson claimed that the CDC's policy of racially segregating all inmates in reception-center cells violated his rights under the Equal Protection Clause. Johnson sought damages, alleging that former CDC Directors Rowland and Gomez, in their individual capacities, violated his constitutional rights by formulating and implementing the CDC's housing policy. He also sought injunctive relief against former CDC Director Stephen Cambra.

Johnson has consistently challenged, and the CDC has consistently defended, the policy as a whole—as it relates to both new inmates and inmates transferred from other facilities. Johnson was first segregated in 1987 as a new inmate when he entered the CDC facility at Folsom. Since 1987, he has been segregated each time he has been transferred to a new facility. Thus, he has been subject to the CDC's policy both as a new inmate and as an inmate transferred from one facility to another.

After discovery, the parties moved for summary judgment. The District Court granted summary judgment to the defendants on grounds that they were entitled to qualified immunity because their conduct was not clearly unconstitutional. The Court of Appeals for the Ninth Circuit affirmed. 321 F. 3d 791 (2003). It held that the constitutionality of the CDC's policy should be reviewed under the deferential standard we articulated in *Turner* v. *Safley*, 482 U. S. 78 (1987)—not strict scrutiny. 321 F. 3d, at 798–799. Applying *Turner*, it held that Johnson had the burden of refuting the "common-sense connection" between the policy and

prison violence. 321 F. 3d, at 802. Though it believed this was a "close case," *id.*, at 798, the Court of Appeals concluded that the policy survived *Turner*'s deferential standard, 321 F. 3d, at 807.

The Court of Appeals denied Johnson's petition for rehearing en banc. Judge Ferguson, joined by three others, dissented on grounds that "[t]he panel's decision ignore[d] the Supreme Court's repeated and unequivocal command that all racial classifications imposed by the government must be analyzed by a reviewing court under strict scrutiny, and fail[ed] to recognize that [the] *Turner* analysis is inapplicable in cases, such as this one, in which the right asserted is not inconsistent with legitimate penological objectives." 336 F. 3d 1117 (2003) (internal quotation marks and citations omitted). We granted certiorari to decide which standard of review applies. 540 U. S. 1217 (2004).

## II

### A

We have held that "*all* racial classifications [imposed by government] . . . must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 227 (1995) (emphasis added). Under strict scrutiny, the government has the burden of proving that racial classifications "are narrowly tailored measures that further compelling governmental interests." *Ibid.* We have insisted on strict scrutiny in every context, even for so-called "benign" racial classifications, such as race-conscious university admissions policies, see *Grutter* v. *Bollinger,* 539 U. S. 306, 326 (2003), race-based preferences in government contracts, see *Adarand, supra,* at 226, and race-based districting intended to improve minority representation, see *Shaw* v. *Reno,* 509 U. S. 630, 650 (1993).

The reasons for strict scrutiny are familiar. Racial classifications raise special fears that they are motivated by an invidious purpose. Thus, we have admonished time and

again that, "[a]bsent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining . . . what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 493 (1989) (plurality opinion). We therefore apply strict scrutiny to *all* racial classifications to "'smoke out' illegitimate uses of race by assuring that [government] is pursuing a goal important enough to warrant use of a highly suspect tool." *Ibid.*[1]

The CDC claims that its policy should be exempt from our categorical rule because it is "neutral"—that is, it "neither benefits nor burdens one group or individual more than any other group or individual." Brief for Respondents 16. In other words, strict scrutiny should not apply because all prisoners are "equally" segregated. The CDC's argument ignores our repeated command that "racial classifications receive close scrutiny even when they may be said to burden or benefit the races equally." *Shaw, supra,* at 651. Indeed, we rejected the notion that separate can ever be equal—or "neutral"—50 years ago in *Brown* v. *Board of Education,* 347 U. S. 483 (1954), and we refuse to resurrect it today. See also *Powers* v. *Ohio*, 499 U. S. 400, 410 (1991) (rejecting the argument that race-based peremptory challenges were permissible because they applied equally to white and black jurors and holding that "[i]t is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree").

We have previously applied a heightened standard of review in evaluating racial segregation in prisons. In *Lee* v.

---

[1] JUSTICE THOMAS takes a hands-off approach to racial classifications in prisons, suggesting that a "compelling showing [is] needed to overcome the deference we owe to prison administrators." *Post,* at 543 (dissenting opinion). But such deference is fundamentally at odds with our equal protection jurisprudence. We put the burden on state actors to demonstrate that their race-based policies are justified.

*Washington,* 390 U. S. 333 (1968) *(per curiam),* we upheld a three-judge court's decision striking down Alabama's policy of segregation in its prisons. *Id.,* at 333–334. Alabama had argued that desegregation would undermine prison security and discipline, *id.,* at 334, but we rejected that contention. Three Justices concurred "to make explicit something that is left to be gathered only by implication from the Court's opinion"—"that prison authorities have the right, acting in good faith and in *particularized circumstances,* to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails." *Ibid.* (emphasis added). The concurring Justices emphasized that they were "unwilling to assume that state or local prison authorities might mistakenly regard such an explicit pronouncement as evincing any dilution of this Court's firm commitment to the Fourteenth Amendment's prohibition of racial discrimination." *Ibid.*

The need for strict scrutiny is no less important here, where prison officials cite racial violence as the reason for their policy. As we have recognized in the past, racial classifications "threaten to stigmatize individuals by reason of their membership in a racial group and to *incite racial hostility.*" *Shaw, supra,* at 643 (citing *J. A. Croson Co., supra,* at 493 (plurality opinion); emphasis added). Indeed, by insisting that inmates be housed only with other inmates of the same race, it is possible that prison officials will breed further hostility among prisoners and reinforce racial and ethnic divisions. By perpetuating the notion that race matters most, racial segregation of inmates "may exacerbate the very patterns of [violence that it is] said to counteract." *Shaw, supra,* at 648; see also Trulson & Marquart, The Caged Melting Pot: Toward an Understanding of the Consequences of Desegregation in Prisons, 36 Law & Soc. Rev. 743, 774 (2002) (in a study of prison desegregation, finding that "over [10 years] the rate of violence between inmates segregated by race in double cells surpassed the rate among those

racially integrated"). See also Brief for Former State Corrections Officials as *Amici Curiae* 19 (opinion of former corrections officials from six States that "racial integration of cells tends to diffuse racial tensions and thus diminish interracial violence" and that "a blanket policy of racial segregation of inmates is contrary to sound prison management").

The CDC's policy is unwritten. Although California claimed at oral argument that two other States follow a similar policy, see Tr. of Oral Arg. 30–31, this assertion was unsubstantiated, and we are unable to confirm or deny its accuracy.[2] Virtually all other States and the Federal Government manage their prison systems without reliance on racial segregation. See Brief for United States as *Amicus Curiae* 24. Federal regulations governing the Federal Bureau of Prisons (BOP) expressly prohibit racial segregation. 28 CFR § 551.90 (2004) ("[BOP] staff shall not discrim-

---

[2] Though, as JUSTICE THOMAS points out, see *post*, at 544–545, and n. 12, inmates in reception centers in Oklahoma and Texas "'are not generally assigned randomly to racially integrated cells,'" it is also the case that "these inmates are not precluded from integrated cell assignments," Oklahoma Dept. of Corrections, Policies and Procedures, Operations Memorandum No. OP–030102, Inmate Housing (Sept. 16, 2004), available at http://www.doc.state.ok.us/docs/policies.htm (as visited Jan. 21, 2005, and available in Clerk of Court's case file); Texas Dept. of Criminal Justice, Security Memorandum No. SM–01.28, Assignment to General Population Two-Person Cells (June 15, 2002). See also Brief for Former State Corrections Officials as *Amici Curiae* 20, n. 10 ("To the extent that race is considered in the assignment calculus in Oklahoma, it appears to be one factor among many, and as a result, individualized consideration is given to all inmates"). We therefore have no way of knowing whether, in practice, inmates in Oklahoma and Texas, like those in California, have close to no chance, App. to Pet. for Cert. 3a, of being celled with a person of a different race. See also Brief for Former State Corrections Officials as *Amici Curiae* 19–20 ("[W]e are aware of no state other than California that assumes that every incoming prisoner is incapable of getting along with a cell mate of a different race. And we are aware of no state other than California that has acted on such an assumption by adopting an inflexible and absolute policy of racial segregation of double cells in reception centers").

inate against inmates on the basis of race, religion, national origin, sex, disability, or political belief. This includes the making of administrative decisions and providing access to work, housing and programs"). The United States contends that racial integration actually "leads to less violence in BOP's institutions and better prepares inmates for re-entry into society." Brief for United States as *Amicus Curiae* 25. Indeed, the United States argues, based on its experience with the BOP, that it is possible to address "concerns of prison security through individualized consideration without the use of racial segregation, unless warranted as a necessary and temporary response to a race riot or other serious threat of race-related violence." *Id.*, at 24. As to transferees, in particular, whom the CDC has already evaluated at least once, it is not clear why more individualized determinations are not possible.

Because the CDC's policy is an express racial classification, it is "immediately suspect." *Shaw,* 509 U. S., at 642; see also *Washington* v. *Seattle School Dist. No. 1,* 458 U. S. 457, 485 (1982). We therefore hold that the Court of Appeals erred when it failed to apply strict scrutiny to the CDC's policy and to require the CDC to demonstrate that its policy is narrowly tailored to serve a compelling state interest.

## B

The CDC invites us to make an exception to the rule that strict scrutiny applies to all racial classifications, and instead to apply the deferential standard of review articulated in *Turner* v. *Safley,* 482 U. S. 78 (1987), because its segregation policy applies only in the prison context. We decline the invitation. In *Turner,* we considered a claim by Missouri prisoners that regulations restricting inmate marriages and inmate-to-inmate correspondence were unconstitutional. *Id.,* at 81. We rejected the prisoners' argument that the regulations should be subject to strict scrutiny, asking instead whether the regulation that burdened the prisoners'

fundamental rights was "reasonably related" to "legitimate penological interests." *Id.*, at 89.

We have never applied *Turner* to racial classifications. *Turner* itself did not involve any racial classification, and it cast no doubt on *Lee.* We think this unsurprising, as we have applied *Turner*'s reasonable-relationship test *only* to rights that are "inconsistent with proper incarceration." *Overton* v. *Bazzetta,* 539 U. S. 126, 131 (2003); see also *Pell* v. *Procunier,* 417 U. S. 817, 822 (1974) ("[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system"). This is because certain privileges and rights must necessarily be limited in the prison context. See *O'Lone* v. *Estate of Shabazz,* 482 U. S. 342, 348 (1987) ("'[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system'" (quoting *Price* v. *Johnston,* 334 U. S. 266, 285 (1948))). Thus, for example, we have relied on *Turner* in addressing First Amendment challenges to prison regulations, including restrictions on freedom of association, *Overton, supra;* limits on inmate correspondence, *Shaw* v. *Murphy,* 532 U. S. 223 (2001); restrictions on inmates' access to courts, *Lewis* v. *Casey,* 518 U. S. 343 (1996); restrictions on receipt of subscription publications, *Thornburgh* v. *Abbott,* 490 U. S. 401 (1989); and work rules limiting prisoners' attendance at religious services, *Shabazz, supra.* We have also applied *Turner* to some due process claims, such as involuntary medication of mentally ill prisoners, *Washington* v. *Harper,* 494 U. S. 210 (1990); and restrictions on the right to marry, *Turner, supra.*

The right not to be discriminated against based on one's race is not susceptible to the logic of *Turner.* It is not a right that need necessarily be compromised for the sake of proper prison administration. On the contrary, compliance with the Fourteenth Amendment's ban on racial discrimina-

tion is not only consistent with proper prison administration, but also bolsters the legitimacy of the entire criminal justice system. Race discrimination is "especially pernicious in the administration of justice." *Rose* v. *Mitchell,* 443 U. S. 545, 555 (1979). And public respect for our system of justice is undermined when the system discriminates based on race. Cf. *Batson* v. *Kentucky,* 476 U. S. 79, 99 (1986) ("[P]ublic respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race"). When government officials are permitted to use race as a proxy for gang membership and violence without demonstrating a compelling government interest and proving that their means are narrowly tailored, society as a whole suffers. For similar reasons, we have not used *Turner* to evaluate Eighth Amendment claims of cruel and unusual punishment in prison. We judge violations of that Amendment under the "deliberate indifference" standard, rather than *Turner*'s "reasonably related" standard. See *Hope* v. *Pelzer,* 536 U. S. 730, 738 (2002) (asking whether prison officials displayed " 'deliberate indifference' to the inmates' health or safety" where an inmate claimed that they violated his rights under the Eighth Amendment (quoting *Hudson* v. *McMillian,* 503 U. S. 1, 8 (1992))). This is because the integrity of the criminal justice system depends on full compliance with the Eighth Amendment. See *Spain* v. *Procunier,* 600 F. 2d 189, 193–194 (CA9 1979) (Kennedy, J.) ("[T]he full protections of the eighth amendment most certainly remain in force [in prison]. The whole point of the amendment is to protect persons convicted of crimes. . . . Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary").

In the prison context, when the government's power is at its apex, we think that searching judicial review of racial classifications is necessary to guard against invidious dis-

crimination. Granting the CDC an exemption from the rule that strict scrutiny applies to all racial classifications would undermine our "unceasing efforts to eradicate racial prejudice from our criminal justice system." *McCleskey* v. *Kemp*, 481 U. S. 279, 309 (1987) (internal quotation marks omitted).

The CDC argues that "[d]eference to the particular expertise of prison officials in the difficult task of managing daily prison operations" requires a more relaxed standard of review for its segregation policy. Brief for Respondents 18. But we have refused to defer to state officials' judgments on race in other areas where those officials traditionally exercise substantial discretion. For example, we have held that, despite the broad discretion given to prosecutors when they use their peremptory challenges, using those challenges to strike jurors on the basis of their race is impermissible. See *Batson, supra,* at 89–96. Similarly, in the redistricting context, despite the traditional deference given to States when they design their electoral districts, we have subjected redistricting plans to strict scrutiny when States draw district lines based predominantly on race. Compare generally *Vieth* v. *Jubelirer*, 541 U. S. 267 (2004) (partisan gerrymandering), with *Shaw* v. *Reno*, 509 U. S. 630 (1993) (racial gerrymandering).

We did not relax the standard of review for racial classifications in prison in *Lee,* and we refuse to do so today. Rather, we explicitly reaffirm what we implicitly held in *Lee:* The "necessities of prison security and discipline," 390 U. S., at 334, are a compelling government interest justifying only those uses of race that are narrowly tailored to address those necessities. See *Grutter*, 539 U. S., at 353 (THOMAS, J., concurring in part and dissenting in part) (citing *Lee* for the principle that "protecting prisoners from violence might justify narrowly tailored racial discrimination"); *J. A. Croson Co.*, 488 U. S., at 521 (SCALIA, J., concurring in judgment) (citing *Lee* for the proposition that "only a social emergency rising to the level of imminent danger to life and limb—for

example, a prison race riot, requiring temporary segregation of inmates—can justify an exception to the principle embodied in the Fourteenth Amendment that '[o]ur Constitution is color-blind, and neither knows nor tolerates classes among citizens'" (quoting *Plessy* v. *Ferguson,* 163 U. S. 537, 559 (1896) (Harlan, J., dissenting))); see also *Pell,* 417 U. S., at 823 ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves").

JUSTICE THOMAS would subject race-based policies in prisons to *Turner*'s deferential standard of review because, in his view, judgments about whether race-based policies are necessary "are better left in the first instance to the officials who run our Nation's prisons." *Post,* at 542. But *Turner* is too lenient a standard to ferret out invidious uses of race. *Turner* requires only that the policy be "reasonably related" to "legitimate penological interests." 482 U. S., at 89. *Turner* would allow prison officials to use race-based policies even when there are race-neutral means to accomplish the same goal, and even when the race-based policy does not in practice advance that goal. See, *e. g.,* 321 F. 3d, at 803 (case below) (reasoning that, under *Turner,* the Court of Appeals did "not have to agree that the policy actually advances the CDC's legitimate interest, but only [that] 'defendants might reasonably have thought that the policy would advance its interests'"). See also *Turner, supra,* at 90 (warning that *Turner* is not a "least restrictive alternative test" (internal quotation marks omitted)).

For example, in JUSTICE THOMAS' world, prison officials could segregate visiting areas on the ground that racial mixing would cause unrest in the racially charged prison atmosphere. Under *Turner,* "[t]he prisoner would have to prove that there would *not* be a riot[.] [But] [i]t is certainly 'plausible' that such a riot could ensue: our society, as well as our prisons, contains enough racists that almost any interracial interaction could potentially lead to conflict." 336 F. 3d, at

1120 (case below) (Ferguson, J., dissenting from denial of rehearing en banc). Indeed, under JUSTICE THOMAS' view, there is no obvious limit to permissible segregation in prisons. It is not readily apparent why, if segregation in reception centers is justified, segregation in the dining halls, yards, and general housing areas is not also permissible. Any of these areas could be the potential site of racial violence. If JUSTICE THOMAS' approach were to carry the day, even the blanket segregation policy struck down in *Lee* might stand a chance of survival if prison officials simply asserted that it was necessary to prison management. We therefore reject the *Turner* standard for racial classifications in prisons because it would make rank discrimination too easy to defend.

The CDC protests that strict scrutiny will handcuff prison administrators and render them unable to address legitimate problems of race-based violence in prisons. See also *post*, at 531–532, 546–547 (THOMAS, J., dissenting). Not so. Strict scrutiny is not "strict in theory, but fatal in fact." *Adarand*, 515 U. S., at 237 (internal quotation marks omitted); *Grutter*, 539 U. S., at 326–327 ("Although all governmental uses of race are subject to strict scrutiny, not all are invalidated by it"). Strict scrutiny does not preclude the ability of prison officials to address the compelling interest in prison safety. Prison administrators, however, will have to demonstrate that any race-based policies are narrowly tailored to that end. See *id.*, at 327 ("When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied").[3]

---

[3] JUSTICE THOMAS characterizes the CDC's policy as a "limited" one, see *post*, at 525, but the CDC's policy is in fact sweeping in its application. It applies to *all* prisoners housed in double cells in reception centers, whether newly admitted or transferred from one facility to another. Moreover, despite JUSTICE THOMAS' suggestion that the CDC considers other nonracial factors in determining housing placements, the CDC itself

The fact that strict scrutiny applies "says nothing about the ultimate validity of any particular law; that determination is the job of the court applying strict scrutiny." *Adarand, supra,* at 229–230. At this juncture, no such determination has been made. On remand, the CDC will have the burden of demonstrating that its policy is narrowly tailored with regard to new inmates as well as transferees. Prisons are dangerous places, and the special circumstances they present may justify racial classifications in some contexts. Such circumstances can be considered in applying strict scrutiny, which is designed to take relevant differences into account.

### III

We do not decide whether the CDC's policy violates the Equal Protection Clause. We hold only that strict scrutiny is the proper standard of review and remand the case to allow the Court of Appeals for the Ninth Circuit, or the District Court, to apply it in the first instance. See *Consolidated Rail Corporation v. Gottshall,* 512 U. S. 532, 557–558 (1994) (reversing and remanding for the lower court to apply the correct legal standard in the first instance); *Lucas v. South Carolina Coastal Council,* 505 U. S. 1003, 1031–1032 (1992) (same). The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE took no part in the decision of this case.

---

has admitted that, in practice, there is a "'[p]retty close'" to zero percent chance that an inmate will be housed with a person of a different race. App. to Pet. for Cert. 3a. See also generally *post,* at 517–518, and n. 1 (STEVENS, J., dissenting). Thus, despite an inmate's "age, physical size, mental health, medical needs, [and] criminal history," *post,* at 536 (THOMAS, J., dissenting), the fact that he is black categorically precludes him from being celled with a white inmate. As we explain, see *infra* this page, we do not decide whether the threat of violence in California prisons is sufficient to justify such a broad policy.

JUSTICE GINSBURG, with whom JUSTICE SOUTER and JUSTICE BREYER join, concurring.

I join the Court's opinion, subject to the reservation expressed in *Grutter* v. *Bollinger*, 539 U. S. 306, 344–346 (2003) (GINSBURG, J., concurring).

The Court today resoundingly reaffirms the principle that state-imposed racial segregation is highly suspect and cannot. be justified on the ground that "'all persons suffer [the separation] in equal degree.'" *Ante,* at 506 (quoting *Powers* v. *Ohio,* 499 U. S. 400, 410 (1991)). While I join that declaration without reservation, I write separately to express again my conviction that the same standard of review ought not control judicial inspection of every official race classification. As I stated most recently in *Gratz* v. *Bollinger,* 539 U. S. 244, 301 (2003) (dissenting opinion): "Actions designed to burden groups long denied full citizenship stature are not sensibly ranked with measures taken to hasten the day when entrenched discrimination and its aftereffects have been extirpated." See also *Grutter,* 539 U. S., at 344–346 (GINSBURG, J., concurring); *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 271–276 (1995) (GINSBURG, J., dissenting).

There is no pretense here, however, that the California Department of Corrections (CDC) installed its segregation policy to "correct inequalities." See Wechsler, The Nationalization of Civil Liberties and Civil Rights, Supp. to 12 Tex. Q. 10, 23 (1968). Experience in other States and in federal prisons, see *ante,* at 508–509; *post,* at 519–520 (STEVENS, J., dissenting), strongly suggests that CDC's race-based assignment of new inmates and transferees, administratively convenient as it may be, is not necessary to the safe management of a penal institution.

Disagreeing with the Court that "strict scrutiny" properly applies to any and all racial classifications, see *ante,* at 505–509, 511–513, 514, but agreeing that the stereotypical classification at hand warrants rigorous scrutiny, I join the Court's opinion.

JUSTICE STEVENS, dissenting.

In my judgment a state policy of segregating prisoners by race during the first 60 days of their incarceration, as well as the first 60 days after their transfer from one facility to another, violates the Equal Protection Clause of the Fourteenth Amendment. The California Department of Corrections (CDC) has had an ample opportunity to justify its policy during the course of this litigation, but has utterly failed to do so whether judged under strict scrutiny or the more deferential standard set out in *Turner* v. *Safley,* 482 U. S. 78 (1987). The CDC had no incentive in the proceedings below to withhold evidence supporting its policy; nor has the CDC made any offer of proof to suggest that a remand for further factual development would serve any purpose other than to postpone the inevitable. I therefore agree with the submission of the United States as *amicus curiae* that the Court should hold the policy unconstitutional on the current record.

The CDC's segregation policy[1] is based on a conclusive presumption that housing inmates of different races together creates an unacceptable risk of racial violence. Under the policy's logic, an inmate's race is a proxy for gang membership, and gang membership is a proxy for violence. The

---

[1] The CDC operates 32 prisons, 7 of which house reception centers. All new inmates and all inmates transferring between prisons are funneled through one of these reception centers before they are permanently placed. At the centers, inmates are housed either in dormitories, double cells, or single cells (of which there are few). Under the CDC's segregation policy, race is a determinative factor in placing inmates in double cells, regardless of the other factors considered in such decisions. While a corrections official with 24 years of experience testified that an exception to this policy was once granted to a Hispanic inmate who had been "raised with Crips," App. 184a, the CDC's suggestion that its policy is therefore flexible, see Brief for Respondents 9, strains credulity. There is no evidence that the CDC routinely allows inmates to opt out of segregation, much less evidence that the CDC informs inmates of their supposed right to do so.

CDC, however, has offered scant empirical evidence or expert opinion to justify this use of race under even a minimal level of constitutional scrutiny. The presumption underlying the policy is undoubtedly overbroad. The CDC has made no effort to prove what fraction of new or transferred inmates are members of race-based gangs, nor has it shown more generally that interracial violence is disproportionately greater than intraracial violence in its prisons. Proclivity toward racial violence unquestionably varies from inmate to inmate, yet the CDC applies its blunderbuss policy to *all* new and transferred inmates housed in double cells regardless of their criminal histories or records of previous incarceration. Under the CDC's policy, for example, two car thieves of different races—neither of whom has any history of gang involvement, or of violence, for that matter—would be barred from being housed together during their first two months of prison. This result derives from the CDC's inflexible judgment that such integrated living conditions are simply too dangerous. This Court has never countenanced such racial prophylaxis.

To establish a link between integrated cells and violence, the CDC relies on the views of two state corrections officials. They attested to their belief that double-celling members of different races would lead to violence and that this violence would spill out into the prison yards. One of these officials, an associate warden, testified as follows:

> "[W]ith the Asian population, the control sergeants have to be more careful than they do with Blacks, Whites, and Hispanics because, for example, you cannot house a Japanese inmate with a Chinese inmate. You cannot. They will kill each other. They won't even tell you about it. They will just do it. The same with Laotians, Vietnamese, Cambodians, Filipinos. You have to be very careful about housing other Asians with other Asians. It's very culturally heavy." App. 189a.

Such musings inspire little confidence. Indeed, this comment supports the suspicion that the policy is based on racial stereotypes and outmoded fears about the dangers of racial integration. This Court should give no credence to such cynical, reflexive conclusions about race. See, *e. g., Palmore* v. *Sidoti,* 466 U. S. 429, 432 (1984) ("Classifying persons according to their race is more likely to reflect racial prejudice than legitimate public concerns; the race, not the person, dictates the category"); *Watson* v. *Memphis,* 373 U. S. 526, 536 (1963) (rejecting the city's plea for delay in desegregating public facilities when "neither the asserted fears of violence and tumult nor the asserted inability to preserve the peace was demonstrated at trial to be anything more than personal speculations or vague disquietudes of city officials").

The very real risk that prejudice (whether conscious or not) partly underlies the CDC's policy counsels in favor of relaxing the usual deference we pay to corrections officials in these matters. We should instead insist on hard evidence, especially given that California's policy is an outlier when compared to nationwide practice. The Federal Bureau of Prisons administers 104 institutions; no similar policy is applied in any of them. Countless state penal institutions are operated without such a policy. An *amici* brief filed by six former state corrections officials with an aggregate of over 120 years of experience managing prison systems in Wisconsin, Georgia, Oklahoma, Kansas, Alaska, and Washington makes clear that a blanket policy of even temporary segregation runs counter to the great weight of professional opinion on sound prison management. See Brief for Former State Corrections Officials as *Amici Curiae* 19. Tellingly, the CDC can only point to two other States, Texas and Oklahoma, that use racial status in assigning inmates in prison reception areas. It is doubtful from the record that these States' policies have the same broad and inflexible sweep as California's, and this is ultimately beside the point. What is important is that the Federal Government and the vast

majority of States address the threat of interracial violence in prisons without resorting to the expedient of segregation.

In support of its policy, the CDC offers poignant evidence that its prisons are infested with violent race-based gangs. The most striking of this evidence involves a series of riots that took place between 1998 and 2001 at Pelican Bay State Prison. That prison houses some of the State's most violent criminal offenders, including "validated" gang members who have been transferred from other prisons. The riots involved both interracial and intraracial violence. In the most serious incident, involving 250–300 inmates, "Southern Hispanic" gang members, joined by some white inmates, attacked a number of black inmates.

Our judicial role, however, requires that we scratch below the surface of this evidence, lest the sheer gravity of a threat be allowed to authorize any policy justified in its name. Upon inspection, the CDC's *post hoc,* generalized evidence of gang violence is only tenuously related to its segregation policy. Significantly, the CDC has not cited a single specific incident of interracial violence between cellmates—much less a *pattern* of such violence—that prompted the adoption of its unique policy years ago. Nor is there any indication that antagonism between cellmates played any role in the more recent riots the CDC mentions. And despite the CDC's focus on prison gangs and its suggestion that such gangs will recruit new inmates into committing racial violence during their 60-day stays in the reception centers, the CDC has cited no evidence of such recruitment, nor has it identified any instances in which new inmates committed racial violence against other new inmates in the common areas, such as the yard or the cafeteria. Perhaps the CDC's evidence might provide a basis for arguing that at Pelican Bay and other facilities that have experienced similar riots, some race-conscious measures are justified if properly tailored. See *Lee* v. *Washington,* 390 U. S. 333, 334 (1968) (Black, J., concurring). But even if the incidents cited by the CDC,

which occurred in the general prison population, were relevant to the conditions in the reception centers, they provide no support for the CDC's decision to apply its segregation policy to *all* of its reception centers, without regard for each center's security level or history of racial violence. Nor do the incidents provide any support for a policy applicable only to cellmates, while the common areas of the prison in which the disturbances occurred remain fully integrated.

Given the inherent indignity of segregation and its shameful historical connotations, one might assume that the CDC came to its policy only as a last resort. Distressingly, this is not so: There is no evidence that the CDC has ever experimented with, or even carefully considered, race-neutral methods of achieving its goals. That the policy is unwritten reflects, I think, the evident lack of deliberation that preceded its creation.

Specifically, the CDC has failed to explain why it could not, as an alternative to automatic segregation, rely on an individualized assessment of each inmate's risk of violence when assigning him to a cell in a reception center. The Federal Bureau of Prisons and other state systems do so without any apparent difficulty. For inmates who are being transferred from one facility to another—who represent approximately 85% of those subject to the segregation policy—the CDC can simply examine their prison records to determine if they have any known gang affiliations or if they have ever engaged in or threatened racial violence. For example, the CDC has had an opportunity to observe petitioner for almost 20 years; surely the CDC could have determined his placement without subjecting him to a period of segregation.[2] For new inmates, assignments can be based on their

[2] In explaining why it cannot prescreen new inmates, the CDC's brief all but concedes that segregating transferred inmates is unnecessary. See Brief for Respondents 42 ("If the officials had all of the necessary information to assess the inmates' violence potential when the inmates arrived, perhaps a different practice could be used. But unlike the federal system,

presentence reports, which contain information about offense conduct, criminal record, and personal history—including any available information about gang affiliations. In fact, state law requires the county probation officer to transmit a presentence report to the CDC along with an inmate's commitment papers. See Cal. Penal Code Ann. § 1203c (West 2004); Cal. Rule of Court 4.411(d) (Criminal Cases) (West Supp. 2004).

Despite the rich information available in these records, the CDC considers these records only rarely in assigning inmates to cells in the reception centers. The CDC's primary explanation for this is administrative inefficiency—the records, it says, simply do not arrive in time. The CDC's counsel conceded at oral argument that presentence reports "have a fair amount of information," but she stated that, "in California, the presentence report does not always accompany the inmate and frequently does not. It follows some period of time later from the county." Tr. of Oral Arg. 33. Despite the state-law requirement to the contrary, counsel informed the Court that the counties are not preparing the presentence reports "in a timely fashion." *Ibid.* Similarly, with regard to transferees, counsel stated that their prison records do not arrive at the reception centers in time to make cell assignments. *Id.*, at 28. Even if such inefficiencies might explain a temporary expedient in some cases, they surely do not justify a systemwide policy. When the State's interest in administrative convenience is pitted against the Fourteenth Amendment's ban on racial segregation, the latter must prevail. When there has been no "serious, good faith consideration of workable race-neutral alternatives that will achieve the [desired goal]," *Grutter* v. *Bollinger*, 539

---

where the inmates generally are in federal custody from the moment they are arrested, state inmates are in county custody until they are convicted and later transferred to the custody of the CDC").

U. S. 306, 339 (2003), and when "obvious, easy alternatives" are available, *Turner*, 482 U. S., at 90, the conclusion that CDC's policy is unconstitutional is inescapable regardless of the standard of review that the Court chooses to apply.[3]

In fact, the CDC's failure to demand timely presentence reports and prison records undercuts the sincerity of its concern for inmate security during the reception process. Race is an unreliable and necessarily underinclusive predictor of violence. Without the inmate-specific information found in the records, there is a risk that corrections officials will, for example, house together inmates of the same race who are nevertheless members of rival gangs, such as the Bloods and Crips.[4]

Accordingly, while I agree that a remand is appropriate for a resolution of the issue of qualified immunity, I respectfully dissent from the Court's refusal to decide, on the basis of the record before us, that the CDC's policy is unconstitutional.

---

[3] Because the *Turner* factors boil down to a tailoring test, and I conclude that the CDC's policy is, at best, an "'exaggerated response'" to its asserted security concerns, see *Turner* v. *Safley*, 482 U. S. 78, 90 (1987), I find it unnecessary to address specifically the other factors, such as whether new and transferred inmates have "alternative means" of exercising their right to equal protection during their period of housing segregation, *id.*, at 89. Indeed, this case demonstrates once again that "[h]ow a court describes its standard of review when a prison regulation infringes fundamental constitutional rights often has far less consequence[s] for the inmates than the actual showing that the court demands of the State in order to uphold the regulation." *Id.*, at 100 (STEVENS, J., concurring in part and dissenting in part).

[4] The CDC's policy may be counterproductive in other ways. For example, an official policy of segregation may initiate new arrivals into a corrosive culture of prison racial segregation, lending credence to the view that members of other races are to be feared and that racial alliances are necessary. While integrated cells encourage inmates to gain valuable cross-racial experiences, segregated cells may well facilitate the formation of race-based gangs. See Brief for Former State Corrections Officials as *Amici Curiae* 19 (citing evidence and experience suggesting that the racial integration of cells on balance decreases interracial violence).

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

The questions presented in this case require us to resolve two conflicting lines of precedent. On the one hand, as the Court stresses, this Court has said that "'*all* racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized.'" *Gratz* v. *Bollinger*, 539 U. S. 244, 270 (2003) (quoting *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 224 (1995); emphasis added). On the other, this Court has no less categorically said that "the [relaxed] standard of review we adopted in *Turner* [v. *Safley*, 482 U. S. 78 (1987),] applies to *all* circumstances in which the needs of prison administration implicate constitutional rights." *Washington* v. *Harper*, 494 U. S. 210, 224 (1990) (emphasis added).

Emphasizing the former line of cases, the majority resolves the conflict in favor of strict scrutiny. I disagree. The Constitution has always demanded less within the prison walls. Time and again, even when faced with constitutional rights no less "fundamental" than the right to be free from state-sponsored racial discrimination, we have deferred to the reasonable judgments of officials experienced in running this Nation's prisons. There is good reason for such deference in this case. California oversees roughly 160,000 inmates in prisons that have been a breeding ground for some of the most violent prison gangs in America—all of them organized along racial lines. In that atmosphere, California racially segregates a portion of its inmates, in a part of its prisons, for brief periods of up to 60 days, until the State can arrange permanent housing. The majority is concerned with sparing inmates the indignity and stigma of racial discrimination. *Ante,* at 507–508. California is concerned with their safety and saving their lives. I respectfully dissent.

I

To understand this case, one must understand just how limited the policy at issue is. That requires more factual background than the Court's opinion provides. Petitioner Garrison Johnson is a black inmate in the California Department of Corrections (CDC), currently serving his sentence for murder, robbery, and assault with a deadly weapon. App. 255a–256a, 259a. Johnson began serving his sentence in June 1987 at the California Institution for Men in Chino, California. *Id.,* at 79a, 264a. Since that time he has been transferred to a number of other facilities within the CDC. *Id.,* at 79a–82a.

When an inmate like Johnson is admitted into the California prison system or transferred between the CDC's institutions, he is housed initially for a brief period—usually no more than 60 days—in one of California's prison reception centers for men. *Id.,* at 303a–305a. CDC, Department Operations Manual §61010.3 (2004) (hereinafter CDC Operations Manual), available at http://www.corr.ca.gov/ RegulationsPolicies/PDF/DOM/00_dept_ops_maunal.pdf (all Internet materials as visited Feb. 18, 2005, and available in Clerk of Court's case file). In 2003, the centers processed more than 40,000 newly admitted inmates, almost 72,000 inmates returned from parole, over 14,000 inmates admitted for other reasons, and some portion of the 254,000 inmates who were transferred from one prison to another. CDC, Movement of Prison Population 3 (2003).

At the reception center, prison officials have limited information about an inmate, "particularly if he has never been housed in any CDC facility." App. 303a. The inmate therefore is classified so that prison officials can place the inmate in appropriate permanent housing. During this process, the CDC evaluates the inmate's "physical, mental and emotional health." *Ibid.* The CDC also reviews the inmate's criminal

history and record in jail to assess his security needs and classification level. *Id.*, at 304a. Finally, the CDC investigates whether the inmate has any enemies in prison. *Ibid.* This process determines the inmate's ultimate housing placement and has nothing to do with race.

While the process is underway, the CDC houses the inmate in a one-person cell, a two-person cell, or a dormitory. *Id.*, at 305a. The few single cells available at reception centers are reserved for inmates who present special security problems, including those convicted of especially heinous crimes or those in need of protective custody. See, *e. g.*, CDC Operations Manual § 61010.11.3. At the other end of the spectrum, lower risk inmates are assigned to dormitories. App. 189a–190a. Placement in either a single cell or a dormitory has nothing to do with race, except that prison officials attempt to maintain a racial balance within each dormitory. *Id.*, at 250a. Inmates placed in single cells or dormitories lead fully integrated lives: The CDC does not distinguish based on race at any of its facilities when it comes to jobs, meals, yard and recreation time, or vocational and educational assignments. *Ibid.*

Yet some prisoners, like Johnson, neither require confinement in a single cell nor may be safely housed in a dormitory. The CDC houses these prisoners in double cells during the 60-day period. In pairing cellmates, race is indisputably the predominant factor. *Id.*, at 305a, 309a. California's reason is simple: Its prisons are dominated by violent gangs. Brief for Respondents 1–5. And as the largest gangs' names indicate—the Aryan Brotherhood, the Black Guerrilla Family, the Mexican Mafia, the Nazi Low Riders, and La Nuestra Familia—they are organized along racial lines. See Part II–B, *infra.*

According to the State, housing inmates in double cells without regard to race threatens not only prison discipline, but also the physical safety of inmates and staff. App. 305a–306a, 310a–311a. That is because double cells are es-

pecially dangerous. The risk of racial violence in public areas of prisons is high, and the tightly confined, private conditions of cells hazard even more violence. Prison staff cannot see into the cells without going up to them, and inmates can cover the windows to prevent the staff from seeing inside the cells. *Id.*, at 306a. The risk of violence caused by this privacy is grave, for inmates are confined to their cells for much of the day. *Ibid.; id.*, at 187a–188a.

Nevertheless, while race is the predominant factor in pairing cellmates, it is hardly the only one. After dividing this subset of inmates based on race, the CDC further divides them based on geographic or national origin. As an example, Hispanics from northern and southern California are not housed together in reception centers because they often belong to rival gangs—La Nuestra Familia and the Mexican Mafia, respectively. *Id.*, at 185a. Likewise, Chinese and Japanese inmates are not housed together, nor are Cambodians, Filipinos, Laotians, or Vietnamese. *Id.*, at 189a. In addition to geographic and national origin, prison officials consider a host of other factors, including inmates' age, mental health, medical needs, criminal history, and gang affiliation. *Id.*, at 304a, 309a. For instance, when Johnson was admitted in 1987, he was a member of the Crips, a black street gang. *Id.*, at 93a. He was therefore ineligible to be housed with nonblack inmates. *Id.*, at 183a; Brief for Respondents 12, n. 9.

Moreover, while prison officials consider race in assigning inmates to double cells, the record shows that inmates are not necessarily housed with other inmates of the same race during that 60-day period. When a Hispanic inmate affiliated with the Crips asked to be housed at the reception center with a black inmate, for example, prison administrators granted his request. App. 183a–184a, 199a. Such requests are routinely granted after the 60-day period, when prison officials complete the classification process and transfer an

inmate from the reception center to a permanent placement at that prison or another one.[1]  *Id.*, at 311a–312a.

## II

Traditionally, federal courts rarely involved themselves in the administration of state prisons, "adopt[ing] a broad hands-off attitude toward problems of prison administration."[2]  *Procunier* v. *Martinez,* 416 U. S. 396, 404 (1974). For most of this Nation's history, only law-abiding citizens could claim the cover of the Constitution: Upon conviction and incarceration, defendants forfeited their constitutional rights and possessed instead only those rights that the State chose to extend them.  See, *e. g., Shaw* v. *Murphy,* 532 U. S. 223, 228 (2001); *Ruffin* v. *Commonwealth,* 62 Va. 790, 796 (1871).  In recent decades, however, this Court has decided

---

[1] Johnson has never requested—not during his initial admittance, nor his subsequent transfers, nor his present incarceration—that he be housed with a person of a different race.  App. 106a, 112a–113a, 175a.  According to Johnson, he considered the policy a barrier to any such request; however, Johnson has also testified that he never filed a grievance with prison officials about the segregation policy.  *Id.*, at 112a–113a, 124a–125a.  Neither the parties nor the majority discusses whether Johnson has exhausted his action under Rev. Stat. § 1979, 42 U. S. C. § 1983, as required by the Prison Litigation Reform Act of 1995, 110 Stat. 1321–66, as amended, 42 U. S. C. § 1997e(a).  See *Booth* v. *Churner,* 532 U. S. 731, 734 (2001).  The majority thus assumes that statutorily mandated exhaustion is not jurisdictional, and that California has waived the issue by failing to raise it. See, *e. g., Richardson* v. *Goord,* 347 F. 3d 431, 433–434 (CA2 2003); *Perez* v. *Wisconsin Dept. of Corrections,* 182 F. 3d 532, 536 (CA7 1999).

[2] The majority refers to my approach as a "hands-off" one because I would accord deference to the judgments of the State's prison officials. See *ante,* at 506, n. 1.  Its label is historically inaccurate.  The "hands-off" approach was that taken prior to the 1960's by federal courts, which generally declined to consider the merits of prisoners' claims.  See, *e. g.,* J. Fliter, Prisoners' Rights: The Supreme Court and Evolving Standards of Decency 64–65 (2001); M. Feeley & E. Rubin, Judicial Policy Making and the Modern State 30–34 (2000); S. Krantz & L. Branham, Cases and Materials on the Law of Sentencing, Corrections and Prisoners' Rights 264–265 (4th ed. 1991).

that incarceration does not divest prisoners of all constitutional protections. See, *e. g.*, *Wolff* v. *McDonnell*, 418 U. S. 539, 555–556 (1974) (the right to due process); *Cruz* v. *Beto*, 405 U. S. 319, 322 (1972) *(per curiam)* (the right to free exercise of religion).[3]

At the same time, this Court quickly recognized that the extension of the Constitution's demands behind prison walls had to accommodate the needs of prison administration. This Court reached that accommodation in *Turner* v. *Safley*, 482 U. S. 78 (1987), which "adopted a unitary, deferential standard for reviewing prisoners' constitutional claims," *Shaw*, *supra*, at 229. That standard should govern Johnson's claims, as it has governed a host of other claims challenging conditions of confinement, even when restricting the rights at issue would otherwise have occasioned strict scrutiny. Under the *Turner* standard, the CDC's policy passes constitutional muster because it is reasonably related to legitimate penological interests.

## A

Well before *Turner*, this Court recognized that experienced prison administrators, and not judges, are in the best position to supervise the daily operations of prisons across this country. See, *e. g.*, *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, 433 U. S. 119, 125 (1977) (courts must give "appropriate deference to the decisions of prison administrators"); *Procunier*, *supra*, at 405 ("[C]ourts are ill equipped to deal with the increasingly urgent problems of prison ad-

---

[3] A prisoner may not entirely surrender his constitutional rights at the prison gates, *Bell* v. *Wolfish*, 441 U. S. 520, 545 (1979); *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, 433 U. S. 119, 129 (1977), but certainly he leaves some of his liberties behind him. When a prisoner makes a constitutional claim, the initial question should be whether the prisoner possesses the right at issue at all, or whether instead the prisoner has been divested of the right as a condition of his conviction and confinement. See *Overton* v. *Bazzetta*, 539 U. S. 126, 140 (2003) (THOMAS, J., concurring in judgment); *Coffin* v. *Reichard*, 143 F. 2d 443, 445 (CA6 1944).

ministration and reform"). *Turner* made clear that a deferential standard of review would apply across the board to inmates' constitutional challenges to prison policies.

At issue in *Turner* was the constitutionality of a pair of Missouri prison regulations limiting inmate-to-inmate correspondence and inmate marriages. The Court's analysis proceeded in two steps. First, the Court recognized that prisoners are not entirely without constitutional rights. As proof, it listed certain constitutional rights retained by prisoners, including the right to be "protected against invidious racial discrimination . . . , *Lee* v. *Washington*, 390 U. S. 333 (1968)." *Turner*, 482 U. S., at 84. Second, the Court concluded that for prison administrators rather than courts to "'make the difficult judgments concerning institutional operations,'" *id.*, at 89 (quoting *Jones, supra,* at 128), courts should uphold prison regulations that impinge on those constitutional rights if they reasonably relate to legitimate penological interests, 482 U. S., at 89. Nowhere did the Court suggest that *Lee's* right to be free from racial discrimination was immune from *Turner's* deferential standard of review. To the contrary, "[w]e made quite clear that the standard of review we adopted in *Turner* applies to *all* circumstances in which the needs of prison administration implicate constitutional rights." *Harper*, 494 U. S., at 224 (emphasis added).

Consistent with that understanding, this Court has applied *Turner's* standard to a host of constitutional claims by prisoners, regardless of the standard of review that would apply outside prison walls.[4] And this Court has adhered to

---

[4] See, *e. g., Overton, supra,* at 132 (the right to association under the First and Fourteenth Amendments); *Shaw* v. *Murphy*, 532 U. S. 223, 228–229 (2001) (the right to communicate with fellow inmates under the First Amendment); *Lewis* v. *Casey*, 518 U. S. 343, 361 (1996) (the right of access to the courts under the Due Process and Equal Protection Clauses); *Washington* v. *Harper*, 494 U. S. 210, 223–225 (1990) (the right to refuse forced medication under the Due Process Clause); *Thornburgh* v. *Abbott*, 490 U. S. 401, 413–414 (1989) (the right to receive correspondence under the

*Turner* despite being urged to adopt different standards of review based on the constitutional provision at issue. See *Harper, supra,* at 224 (*Turner*'s standard of review "appl[ies] in all cases in which a prisoner asserts that a prison regulation violates the Constitution, *not just those in which the prisoner invokes the First Amendment*" (emphasis added)); *O'Lone* v. *Estate of Shabazz,* 482 U. S. 342, 353 (1987) ("We take this opportunity to reaffirm our refusal, *even where claims are made under the First Amendment,* to substitute our judgment on . . . difficult and sensitive matters of institutional administration for the determinations of those charged with the formidable task of running a prison" (internal quotation marks and citation omitted; emphasis added)). Our steadfast adherence makes sense: If *Turner* is our accommodation of the Constitution's demands to those of prison administration, see *supra,* at 530, we should apply it uniformly to prisoners' challenges to their conditions of confinement.

After all, Johnson's claims, even more than other claims to which we have applied *Turner*'s test, implicate *Turner*'s rationale. In fact, in a passage that bears repeating, the *Turner* Court explained precisely why deference to the judgments of California's prison officials is necessary:

> "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative

First Amendment); *O'Lone* v. *Estate of Shabazz,* 482 U. S. 342, 349–350 (1987) (the right to free exercise of religion under the First Amendment).

problem, thereby unnecessarily perpetuating the involvement of the federal courts in affairs of prison administration." 482 U. S., at 89 (internal quotation marks and alteration omitted).

The majority's failure to heed that advice is inexplicable, especially since *Turner* itself recognized the "growing problem with prison gangs." *Id.*, at 91. In fact, there is no more "intractable problem" inside America's prisons than racial violence, which is driven by race-based prison gangs. See, *e. g., Dawson* v. *Delaware*, 503 U. S. 159, 172–173, and n. 1 (1992) (THOMAS, J., dissenting); *Stefanow* v. *McFadden*, 103 F. 3d 1466, 1472 (CA9 1996) ("Anyone familiar with prisons understands the seriousness of the problems caused by prison gangs that are fueled by actively virulent racism and religious bigotry").

### B

The majority decides this case without addressing the problems that racial violence poses for wardens, guards, and inmates throughout the federal and state prison systems. But that is the core of California's justification for its policy: It maintains that, if it does not racially separate new cellmates thrown together in close confines during their initial admission or transfer, violence will erupt.

The dangers California seeks to prevent are real. See Brief for National Association of Black Law Enforcement Officers, Inc., as *Amicus Curiae* 12. Controlling prison gangs is the central challenge facing correctional officers and administrators. Carlson, Prison Interventions: Evolving Strategies to Control Security Threat Groups, 5 Corrections Mgmt. Q. 10 (Winter 2001) (hereinafter Carlson). The worst gangs are highly regimented and sophisticated organizations that commit crimes ranging from drug trafficking to theft and murder. *Id.*, at 12; Cal. Dept. of Justice, Division of Law Enforcement, Organized Crime in California Annual Report to the California Legislature 2003, p. 15, available

at http://caag.state.ca.us/publications/org_crime.pdf.   In fact, street gangs are often just an extension of prison gangs, their " 'foot soldiers' " on the outside.   *Ibid.;* Willens, Structure, Content and the Exigencies of War: American Prison Law After Twenty-Five Years 1962–1987, 37 Am. U. L. Rev. 41, 55–56 (1987).   And with gang membership on the rise, the percentage of prisoners affiliated with prison gangs more than doubled in the 1990's.[5]

The problem of prison gangs is not unique to California,[6] but California has a history like no other.   There are at least five major gangs in this country—the Aryan Brotherhood, the Black Guerrilla Family, the Mexican Mafia, La Nuestra Familia, and the Texas Syndicate—all of which originated in California's prisons.[7]   Unsurprisingly, then, California has the largest number of gang-related inmates of any correctional system in the country, including the Federal Government.   Carlson 16.

As their very names suggest, prison gangs like the Aryan Brotherhood and the Black Guerrilla Family organize themselves along racial lines, and these gangs perpetuate hate and violence.   Irwin 182, 184.   Interracial murders and as-

_____

[5] See National Gang Crime Research Center, A National Assessment of Gangs and Security Threat Groups (STGs) in Adult Correctional Institutions: Results of the 1999 Adult Corrections Survey, p. 5, http://www.ngcrc.com/ngcrc/page7.htm.

[6] See, *e. g., Fraise* v. *Terhune,* 283 F. 3d 506, 512–513 (CA3 2002) (describing violence caused by a single black prison gang, the Five Percent Nation, in various New Jersey correctional facilities); *Conroy* v. *Dingle,* No. Civ. 01–1626 (RHK/RLE), 2002 WL 31357055, *1–*2 (D. Minn., Oct. 11, 2002) (describing rival racial gangs at Minnesota's Moose Lake facility, a medium security prison).

[7] See D. Orlando-Morningstar, Prison Gangs, Special Needs Offenders Bulletin, Federal Judicial Center 4 (Oct. 1997); see also J. Irwin, Prisons in Turmoil 189 (1980) (hereinafter Irwin) (describing the establishment and rise of gangs inside the California prison system, first the Mexican Mafia, followed by La Nuestra Familia, the Aryan Brotherhood, and the Black Guerrilla Family); *United States* v. *Shryock,* 342 F. 3d 948, 961 (CA9 2003) (detailing rise of Mexican Mafia inside the California prison system).

saults among inmates perpetrated by these gangs are common.[8] And, again, that brutality is particularly severe in California's prisons. See, e. g., *Walker* v. *Gomez*, 370 F. 3d 969, 971 (CA9 2004) (describing "history of significant racial tension and violence" at Calipatria State Prison); *id.*, at 979–980 (Rymer, J., dissenting) (same); App. 297a–299a (describing 2-year span at Pelican Bay Prison, during which there were no fewer than nine major riots that left at least one inmate dead and many more wounded).

## C

It is against this backdrop of pervasive racial violence that California racially segregates inmates in the reception centers' double cells, for brief periods of up to 60 days, until such time as the State can assign permanent housing. Viewed in that context and in light of the four factors enunciated in *Turner*, California's policy is constitutional: The CDC's policy is reasonably related to a legitimate penological interest; alternative means of exercising the restricted right remain open to inmates; racially integrating double cells might negatively impact prison inmates, staff, and administrators; and there are no obvious, easy alternatives to the CDC's policy.

### 1

First, the policy is reasonably related to a legitimate penological interest. *Turner, supra,* at 89. The protection of inmates and staff is undeniably a legitimate penological interest. See *Bell* v. *Wolfish*, 441 U. S. 520, 546–547 (1979).

---

[8] See, e. g., *id.*, at 962–969 (describing a host of murders and attempted murders by a handful of Mexican Mafia members); *United States* v. *Silverstein*, 732 F. 2d 1338, 1341–1342 (CA7 1984) (describing murder of a black inmate by members of the Aryan Brotherhood); *State* v. *Kell*, 61 P. 3d 1019, 1024–1025 (Utah 2002) (describing fatal stabbing of a black inmate by two white supremacists); *State* v. *Farmer*, 126 Ariz. 569, 570–571, 617 P. 2d 521, 522–523 (1980) (en banc) (describing murder of a black inmate by members and recruits of the Aryan Brotherhood).

The evidence shows, and Johnson has never contested, that the objective of California's policy is reducing violence among the inmates and against the staff. No cells are designated for, nor are special privileges afforded to, any racial group. App. 188a, 305a. Because prison administrators use race as a factor in making initial housing assignments "solely on the basis of [its] potential implications for prison security," the CDC's cell assignment practice is neutral. *Thornburgh* v. *Abbott*, 490 U. S. 401, 415 (1989); *Turner*, 482 U. S., at 90.

California's policy bears a valid, rational connection to this interest. The racial component to prison violence is impossible for prison administrators to ignore. Johnson himself testified that he is afraid of violence—based solely on the color of his skin.[9] In combating that violence, an inmate's arrival or transfer into a new prison setting is a critical time for inmate and staff alike. The policy protects an inmate from other prisoners, and they from him, while prison officials gather more information, including his gang affiliation, about his compatibility with other inmates. App. 249a. This connection between racial violence and the policy makes it far from "arbitrary or irrational." *Turner, supra,* at 89–90.

Indeed, Johnson concedes that it would be perfectly constitutional for California to take account of race "as part of an overall analysis of proclivity to violence based upon a series of facts existing in that prison." Tr. of Oral Arg. 15. But that is precisely what California does. It takes into account a host of factors in addition to race: geographic or national

---

[9] Specifically, Johnson testified:

"I was incarcerated at Calipatria before the major riot broke out there with Mexican and black inmates. . . . If I would have stayed there, I would have been involved in that because you have four facilities there and *each facility went on a major riot and a lot of people got hurt and injured just based on your skin color.* I'm black, and if I was there I would have been hurt." App. 102a (emphasis added).

origin, age, physical size, mental health, medical needs, criminal history, and, of course, gang affiliation. *Supra*, at 527. California does not simply assign inmates to double cells in the reception centers based on race—it also separates *intra*racially (for example, northern from southern Hispanics or violent from nonviolent offenders).

### 2

Second, alternative means of exercising the restricted right remain open to inmates like Johnson. *Turner, supra,* at 90. The CDC submits, and Johnson does not contest, that all other facets of prison life are fully integrated: work, vocational, and educational assignments; dining halls; and exercise yards and recreational facilities. App. 250a. And after a brief detention period at the reception center, inmates may select their own cellmates regardless of race in the absence of overriding security concerns. *Id.*, at 311a–312a. Simply put, Johnson has spent, and will continue to spend, the vast bulk of his sentence free from any limitation on the race of his cellmate.

### 3

Third, Johnson fails to establish that the accommodation he seeks—*i. e.*, assigning inmates to double cells without regard to race—would not significantly impact prison personnel, other inmates, and the allocation of prison resources. *Harper*, 494 U. S., at 226–227; *Turner, supra,* at 90. Prison staff cannot see into the double cells without going up to them, and inmates can cover the windows so that staff cannot see inside the cells at all. App. 306a. Because of the limited number of staff to oversee the many cells, it "would be very difficult to assist inmates if the staff were needed in several places at one time." *Ibid.* Coordinated gang attacks against nongang cellmates could leave prison officials unable to respond effectively. In any event, diverting prison resources to monitor cells disrupts services elsewhere.

Then, too, fights in the cells are likely to spill over to the exercise yards and common areas. *Ibid.;* see also *id.,* at 187a. As *Turner* made clear: "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." 482 U. S., at 90; see also *White* v. *Morris,* 832 F. Supp. 1129, 1130 (SD Ohio 1993) (racially integrated double-celling contributed to a race riot in which 10 people were murdered). California prison officials are united in the view that racially integrating double cells in the reception centers would lead to serious violence.[10] This is precisely the sort of testimony that the Court found persuasive in *Turner* itself. 482 U. S., at 92.

### 4

Finally, Johnson has not shown that there are "obvious, easy alternatives" to the CDC's policy. *Id.,* at 90. Johnson contends that, for newly admitted inmates, prison officials need only look to the information available in the presentence report that must accompany a convict to prison. See Cal. Penal Code Ann. § 1203(c) (West 2004); Cal. Rules of Ct., Crim., Rule 4.411(d) (West Supp. 2004). But prison officials already do this to the extent that they can. Indeed, gang affiliation, not race, is the first factor in determining initial housing assignments. App. 315a. Race becomes the predominant factor only because gang affiliation is often not known, especially with regard to newly admitted inmates. As the Court of Appeals pointed out: "There is little chance

---

[10] See *id.,* at 245a–246a (Cambra declaration) ("If race were to be disregarded entirely, however, I am certain, based upon my experience with CDC prisoners, that . . . there will be fights in the cells and the problems will emanate onto the prison yards"); *id.,* at 250a–251a (Schulteis declaration) ("At CSP-Lancaster, if we were to disregard the initial housing placement [according to race], then I am certain there would be serious violence among inmates. I have worked in five different CDC institutions and this would be true for all of them").

that inmates will be forthcoming about their past violent episodes or criminal gang activity so as to provide an accurate and dependable picture of the inmate." 321 F. 3d 791, 806 (CA9 2003); see also App. 185a, 189a. Even if the CDC had the manpower and resources to prescreen the more than 40,000 new inmates it receives yearly, leafing through presentence reports would not tell prison officials what they need to know. See *ante*, at 521–523 (STEVENS, J., dissenting).

Johnson presents a closer case with regard to the segregation of prisoners whom the CDC transfers between facilities. As I understand it, California has less need to segregate prisoners about whom it already knows a great deal (since they have undergone the initial classification process and been housed for some period of time). However, this does not inevitably mean that racially integrating transferred inmates, while obvious and easy, is a true alternative. For instance, an inmate may have affiliated with a gang since the CDC's last official assessment, or his past lack of racial violence may have been due to the absence of close confinement with members of other races. The CDC's policy does not appear to arise from laziness or neglect; California is a leader in institutional intelligence gathering. See Carlson 16 ("The CDC devotes 75 intelligence staff to gathering and verifying inmate-related information," both in prisons and on the streets). In short, applying the policy to transfers is not "arbitrary or irrational," requiring that we set aside the considered contrary judgment of prison administrators. *Turner, supra,* at 89–90.

### III

The majority claims that strict scrutiny is the applicable standard of review based on this Court's precedents and its general skepticism of racial classifications. It is wrong on both scores.

### A

Only once before, in *Lee* v. *Washington,* 390 U. S. 333 (1968) *(per curiam),* has this Court considered the constitu-

tionality of racial classifications in prisons. The majority claims that *Lee* applied "a heightened standard of review." *Ante*, at 506. But *Lee* did not address the applicable standard of review. And even if it bore on the standard of review, *Lee* would support the State here.

In *Lee*, a three-judge District Court ordered Alabama to desegregate its prisons under *Brown* v. *Board of Education*, 347 U. S. 483 (1954). *Washington* v. *Lee*, 263 F. Supp. 327, 331–332 (MD Ala. 1966). In so doing, the District Court rejected any notion that "consideration[s] of prison security or discipline" justified the "complete and permanent segregation of the races in all the Alabama penal facilities." *Id.*, at 331. However, the District Court noted "that in some isolated instances prison security and discipline necessitates segregation of the races for a limited period." *Ibid.* (footnote omitted). It provided only one example—"the 'tank' used in . . . large municipal jails where intoxicated persons are placed upon their initial incarceration and kept until they become sober," *id.*, at 331, n. 6—and the court left unmentioned why it would have been necessary to separate drunk whites from blacks on a Birmingham Saturday night.

This Court, in a *per curiam*, one-paragraph opinion, affirmed the District Court's order. It found "unexceptionable" not only the District Court's general rule that wholesale segregation of penal facilities was unconstitutional, but also the District Court's "allowance for the necessities of prison security and discipline." *Lee*, 390 U. S., at 334. Indeed, Justices Black, Harlan, and Stewart concurred

> "to make explicit something that is left to be gathered only by implication from the Court's opinion. This is that prison authorities have the right, acting in good faith and in particularized circumstances, to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails." *Ibid.*

Those Justices were "unwilling to assume" that such an "explicit pronouncement [would] evinc[e] any dilution of this Court's firm commitment to the Fourteenth Amendment's prohibition of racial discrimination." *Ibid.*

*Lee* said nothing about the applicable standard of review, for there was no need. Surely Alabama's wholesale segregation of its prisons was unconstitutional even under the more deferential standard of review that applies within prisons. This Court's brief, *per curiam* opinion in *Lee* simply cannot bear the weight or interpretation the majority places on it. See *U. S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U. S. 18, 24 (1994) (noting "our customary skepticism toward *per curiam* dispositions that lack the reasoned consideration of a full opinion"); *Edelman* v. *Jordan*, 415 U. S. 651, 670–671 (1974).

Yet even if *Lee* had announced a heightened standard of review for prison policies that pertain to race, *Lee* also carved out an exception to the standard that California's policy would certainly satisfy. As the *Lee* concurrence explained without objection, the Court's exception for "the necessities of prison security and discipline" meant that "prison authorities have the right, acting in *good faith* and in *particularized circumstances*, to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails." 390 U. S., at 334 (opinion of Black, Harlan, and Stewart, JJ., concurring) (emphasis added).

California's policy—which is a far cry from the wholesale segregation at issue in *Lee*—would fall squarely within *Lee*'s exception. Johnson has never argued that California's policy is motivated by anything other than a desire to protect inmates and staff. And the "particularized" nature of the policy is evident: It applies only to new inmates and transfers, only in a handful of prisons, only to double cells, and only then for a period of no more than two months. In the name of following a test that *Lee* did not create, the majority

opts for a more demanding standard of review than *Lee*'s language even arguably supports.

The majority heavily relies on this Court's statement that " 'all racial classifications [imposed by government] . . . must be analyzed by a reviewing court under strict scrutiny.' " *Ante*, at 505 (emphasis deleted) (quoting *Adarand Constructors, Inc.*, 515 U. S., at 227).. *Adarand* has nothing to do with this case. *Adarand*'s statement that "all racial classifications" are subject to strict scrutiny addressed the contention that classifications favoring rather than disfavoring blacks are exempt. *Id.*, at 226–227; accord, *Grutter* v. *Bollinger*, 539 U. S. 306, 353 (2003) (THOMAS, J., concurring in part and dissenting in part). None of these statements overruled, *sub silentio*, *Turner* and its progeny, especially since the Court has repeatedly held that constitutional demands are diminished in the unique context of prisons. See, *e. g., Harper*, 494 U. S., at 224; *Abbott*, 490 U. S., at 407; *Turner*, 482 U. S., at 85; see also *Webster* v. *Fall*, 266 U. S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents").

### B

The majority offers various other reasons for applying strict scrutiny. None is persuasive. The majority's main reason is that *"Turner*'s reasonable-relationship test [applies] *only* to rights that are 'inconsistent with proper incarceration.' " *Ante*, at 510 (quoting *Overton* v. *Bazzetta*, 539. U. S. 126, 131 (2003)). According to the majority, the question is thus whether a right "need necessarily be compromised for the sake of proper prison administration." *Ante*, at 510. This inconsistency-with-proper-prison-administration test begs the question at the heart of this case. For a court to know whether any particular right is inconsistent with proper prison administration, it must have some implicit notion of what a proper prison ought to look like and how it

ought to be administered. *Overton, supra,* at 139 (THOMAS, J., concurring in judgment). But the very issue in this case is whether such second-guessing is permissible.

The majority's test eviscerates *Turner.* Inquiring whether a given right is consistent with "proper prison administration" calls for precisely the sort of judgments that *Turner* said courts were ill equipped to make. In none of the cases in which the Court deferred to the judgments of prison officials under *Turner* did it examine whether "proper" prison security and discipline permitted greater speech or associational rights *(Abbott, supra; Shaw,* 532 U. S. 223; and *Overton, supra);* expanded access to the courts *(Lewis* v. *Casey,* 518 U. S. 343 (1996)); broader freedom from bodily restraint *(Harper, supra);* or additional free exercise rights *(O'Lone,* 482 U. S. 342). The Court has steadfastly refused to undertake the threshold standard-of-review inquiry that *Turner* settled, and that the majority today resurrects. And with good reason: As *Turner* pointed out, these judgments are better left in the first instance to the officials who run our Nation's prisons, not to the judges who run its courts.

In place of the Court's usual deference, the majority gives conclusive force to its own guesswork about "proper" prison administration. It hypothesizes that California's policy might incite, rather than diminish, racial hostility.[11] *Ante,*

---

[11] The majority's sole empirical support for its speculation is a study of Texas prison desegregation that found the rate of violence higher in racially segregated double cells. *Ante,* at 507–508 (citing Trulson & Marquart, The Caged Melting Pot: Toward an Understanding of the Consequences of Desegregation in Prisons, 36 Law & Soc. Rev. 743, 774 (2002)). However, the study's authors specifically note that Texas—like California—does not integrate its "initial diagnostic facilities" or its "transfer facilities." See *id.,* at 753, n. 13. Thus the study says nothing about the violence likely to result from integrating cells when inmates are thrown together for brief periods during admittance or transfer. What the study does say is that, once Texas has had the time to gather inmate-related information and make more permanent housing assignments, racially inte-

at 506–508. The majority's speculations are implausible. New arrivals have a strong interest in promptly convincing other inmates of their willingness to use violent force. See Brief for National Association of Black Law Enforcement Officers, Inc., as *Amicus Curiae* 13–14 (citing commentary and congressional findings); cf. *United States* v. *Santiago*, 46 F. 3d 885, 888 (CA9 1995) (describing one Hispanic inmate's murder of another in order to join the Mexican Mafia); *United States* v. *Silverstein*, 732 F. 2d 1338, 1341 (CA7 1984) (prospective members of the Aryan Brotherhood must "make bones," or commit a murder, to be eligible for membership). In any event, the majority's guesswork falls far short of the compelling showing needed to overcome the deference we owe to prison administrators.

The majority contends that the Court "[has] put the burden on state actors to demonstrate that their race-based policies are justified," *ante*, at 506, n. 1, and "[has] refused to defer to state officials' judgments on race in other areas where those officials traditionally exercise substantial discretion," *ante*, at 512. Yet two Terms ago, in upholding the University of Michigan Law School's affirmative-action program, this Court deferred to the judgment by the law school's faculty and administrators on their need for diversity in the student body. See *Grutter, supra*, at 328 ("The Law School's educational judgment that . . . diversity is essential to its educational mission is one to which we defer"). Deference would seem all the more warranted in the prison context, for whatever the Court knows of administering educational institutions, it knows much less about administering penal ones. The potential consequences of second-guessing the judgments of prison administrators are also much more severe. See *White* v. *Morris*, 832 F. Supp. 1129, 1130 (SD Ohio 1993) (racially integrated double-celling that resulted

grated cells may be the preferred option. But California leaves open that door: Inmates are generally free to room with whomever they like on a permanent basis.

from federal consent decree was a factor in the worst prison riot in Ohio history). More importantly, as I have explained, the Court has recognized that the typically exacting review it applies to restrictions on fundamental rights must be relaxed in the unique context of prisons. See, *e. g., Harper,* 494 U. S., at 224; *Abbott,* 490 U. S., at 407; *Turner,* 482 U. S., at 85. The majority cannot fall back on the Constitution's usual demands, because those demands have always been lessened inside the prison walls. See *supra,* at 529.

The majority also mentions that California's policy may be the only one of its kind, as virtually all other States and the Federal Government manage their prison systems without racially segregating inmates. *Ante,* at 508–509. This is both irrelevant and doubtful. It is irrelevant because the number of States that have followed California's lead matters not to the applicable standard of review (the only issue the Court today decides), but to whether California satisfies whatever standard applies, a question the majority leaves to be addressed on remand. In other words, the uniqueness of California's policy might show whether the policy is reasonable or narrowly tailored—but deciding whether to apply *Turner* or strict scrutiny in the first instance must depend on something else, like the majority's inconsistency-with-proper-prison-administration test. The commonness of California's housing policy is further irrelevant because strict scrutiny now applies to all claims of racial discrimination in prisons, regardless of whether the policies being challenged are unusual.

The majority's assertion is doubtful, because at least two other States apply similar policies to newly admitted inmates. Both Oklahoma and Texas, like California, assign newly admitted inmates to racially segregated cells in their prison reception centers.[12] The similarity is not surprising:

---

[12] See Oklahoma Dept. of Corrections, Policies and Procedures, Operations Memorandum No. OP–030102, Inmate Housing (Sept. 16, 2004) ("Upon arrival at the assessment and reception center . . . [f]or reasons of

States like California and Texas have historically had the most severe problems with prison gangs. However, even States with less severe problems maintain that policies like California's are necessary to deal with race-related prison violence. See Brief for States of Utah, Alabama, Alaska, Delaware, Idaho, Nevada, New Hampshire and North Dakota as *Amici Curiae* 16. Relatedly, 10.3% of all wardens at maximum security facilities in the United States report that their inmates are assigned to racially segregated cells—apparently on a *permanent* basis. Henderson, Cullen, Carroll, & Feinberg, Race, Rights, and Order in Prison: A National Survey of Wardens on the Racial Integration of Prison Cells, 80 Prison J. 295, 304 (Sept. 2000). In the same survey, 4.3% of the wardens report that their States have an official policy against racially integrating male inmates in cells. *Id.,* at 302. Presumably, for the remainder of prisons in which inmates are assigned to racially segregated cells, that policy is the result of discretionary decisions by wardens rather than of official state directives. *Ibid.* In any event, the ongoing debate about the best way to reduce racial violence in prisons should not be resolved by judicial decree: It is the job "of prison administrators . . . and not the courts, to make the difficult judgments concerning institutional operations." *Jones,* 433 U. S., at 128.

The majority also observes that we have already carved out an exception to *Turner* for Eighth Amendment claims of cruel and unusual punishment in prison. See *Hope* v. *Pelzer,*

---

safety and security, newly received inmates are not generally assigned randomly to racially integrated cells") (available at http://www.doc.state. ok.us/docs/policies.htm); Texas Dept. of Criminal Justice, Security Memorandum No. SM–01.28, Assignment to General Population Two-Person Cells (June 15, 2002) ("Upon arrival at a reception and diagnostic center . . . [f]or reasons of safety and security, newly-received offenders are not generally assigned randomly to racially integrated cells due to the fact that the specific information needed to assess an offender's criminal and victimization history is not available until after diagnostic processing has been completed").

536 U. S. 730, 738 (2002). In that context, we have held that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer* v. *Brennan*, 511 U. S. 825, 828 (1994). Setting aside whether claims challenging inmates' conditions of confinement should be cognizable under the Eighth Amendment at all, see *Hudson* v. *McMillian*, 503 U. S. 1, 18–19 (1992) (THOMAS, J., dissenting), the "deliberate indifference" standard does not bolster the majority's argument. If anything, that standard is *more* deferential to the judgments of prison administrators than *Turner*'s reasonable-relationship test: It subjects prison officials to liability only when they are subjectively aware of the risk to the inmate, and they fail to take reasonable measures to abate the risk. *Farmer, supra,* at 847. It certainly does not demonstrate the wisdom of an exception that imposes a heightened standard of review on the actions of prison officials.

Moreover, the majority's decision subjects prison officials to competing and perhaps conflicting demands. In this case, California prison officials have uniformly averred that random double-celling poses a substantial risk of serious harm to the celled inmates. App. 245a–246a, 251a. If California assigned inmates to double cells without regard to race, knowing full well that violence might result, that would seem the very definition of deliberate indifference. See *Robinson* v. *Prunty*, 249 F. 3d 862, 864–865 (CA9 2001) (prisoner alleged an Eighth Amendment violation because administrators had *failed* to consider race when releasing inmates into the yards); *Jensen* v. *Clarke*, 94 F. 3d 1191, 1201, 1204 (CA8 1996) (court held that random double-celling by prison officials constituted deliberate indifference, and affirmed an injunction and attorney's fees awarded against the officials). Nor would a victimized inmate need to prove that prison officials had anticipated any particular attack; it would be sufficient that prison officials had ignored a dangerous condi-

tion that was chronic and ongoing—like interracial housing in closely confined quarters within prisons dominated by racial gangs. *Farmer, supra,* at 843–844. Under *Farmer,* prison officials could have been ordered to take account of the very thing to which they may now have to turn a blind eye: inmates' race.

Finally, the majority presents a parade of horribles designed to show that applying the *Turner* standard would grant prison officials unbounded discretion to segregate inmates throughout prisons. See *ante,* at 513–514. But we have never treated *Turner* as a blank check to prison officials. Quite to the contrary, this Court has long had "confidence that . . . a reasonableness standard is not toothless." *Abbott,* 490 U. S., at 414 (internal quotation marks omitted). California prison officials segregate only double cells, because only those cells are particularly difficult to monitor—unlike "dining halls, yards, and general housing areas." *Ante,* at 514. Were California's policy not so narrow, the State might well have race-neutral means at its disposal capable of accommodating prisoners' rights without sacrificing their safety. See *Turner,* 482 U. S., at 90–91. The majority does not say why *Turner*'s standard ably polices all other constitutional infirmities, just not racial discrimination. In any event, it is not the refusal to apply—for the first time ever—a strict standard of review in the prison context that is "fundamentally at odds" with our constitutional jurisprudence. *Ante,* at 506, n. 1. Instead, it is the majority's refusal—for the first time ever—to defer to the expert judgment of prison officials.

## IV

Even under strict scrutiny analysis, "it is possible, even likely, that prison officials could show that the current policy meets the test." 336 F. 3d 1117, 1121 (CA9 2003) (Ferguson, J., joined by Pregerson, Nelson, and Reinhardt, JJ., dissenting from denial of rehearing en banc). As Johnson concedes, all States have a compelling interest in

maintaining order and internal security within their prisons. See Reply Brief for Petitioner 18; see also *Procunier*, 416 U. S., at 404. Thus the question on remand will be whether the CDC's policy is narrowly tailored to serve California's compelling interest.[13] The other dissent notes the absence of evidence on that question, see *ante*, at 518–521 (opinion of STEVENS, J.), but that is hardly California's fault.

From the outset, Johnson himself has alleged, in terms taken from *Turner*, that the CDC's policy is "not related to a legitimate penological interest." *Johnson* v. *California*, 207 F. 3d 650, 655 (CA9 2000) *(per curiam)* (discussing Johnson's Third Amended Complaint). In reinstating Johnson's equal protection claim following the District Court's dismissal, the Court of Appeals repeated Johnson's allegation, without indicating that strict scrutiny should apply on remand before the District Court.[14] *Ibid.* And on remand, again Johnson alleged only that the CDC's policy "is not reasonably related to the legitimate penological interests of the CDC." App. 51a (Fourth Amended Complaint ¶ 23).

After the District Court granted qualified immunity to some of the defendants, Johnson once again appealed. In his brief before the Court of Appeals, Johnson assumed that

---

[13] On the majority's account, deference to the judgments of prison officials in the application of strict scrutiny is presumably warranted to account for "the special circumstances [that prisons] present," *ante*, at 515. See *Grutter* v. *Bollinger*, 539 U. S. 306, 328 (2003). Although I disagree that deference is normally appropriate when scrutinizing racial classifications, there is some logic to the majority's qualification in this case because the Constitution's demands have always been diminished in the prison context. See, *e. g.*, *Harper*, 494 U. S., at 224; *Abbott*, 490 U. S., at 407; *Turner* v. *Safley*, 482 U. S. 78, 85 (1987).

[14] The Court of Appeals cited both *Turner* and *Lee* v. *Washington*, 390 U. S. 333 (1968) *(per curiam)*, for the proposition that certain constitutional protections, among them the protection against state-sponsored racial discrimination, extend to the prison setting. However, the Court of Appeals did not discuss the applicable standard of review, nor did it attempt to resolve the tension between *Turner* and *Lee* that the majority finds.

both *Lee* and *Turner* applied, without arguing that there was any tension between them; indeed, nowhere in his brief did Johnson even mention the words "strict scrutiny." Brief for Appellant in No. 01–56436 (CA9), pp. 20, 26, 2001 WL 34091249. Perhaps as a result, the Court of Appeals did not discuss strict scrutiny in its second decision, the one currently before this Court. The Court of Appeals did find tension between *Lee* and *Turner;* however, it resolved this tension in *Turner*'s favor. 321 F. 3d, at 799. Yet the Court of Appeals accepted *Lee*'s test at face value: Prison officials may only make racial classifications " 'in good faith and in particularized circumstances.' " 321 F. 3d, at 797. The Court of Appeals, like Johnson, did *not* equate *Lee*'s test with strict scrutiny, and in fact it mentioned strict scrutiny only when it quoted the portion of *Turner* that *rejects* strict scrutiny as the proper standard of review in the prison context. 321 F. 3d, at 798. Even Johnson did not make the leap equating *Lee* with strict scrutiny when he requested that the Court of Appeals rehear his case. Appellant's Petition for Panel Rehearing with Suggestion for Rehearing En Banc in No. 01–56436 (CA9), pp. 4–5. That leap was first made by the judges who dissented from the Court of Appeals' denial of rehearing en banc. 336 F. 3d, at 1118 (Ferguson, J., joined by Pregerson, Nelson, and Reinhardt, JJ., dissenting from denial of rehearing en banc).

Thus, California is now, after the close of discovery, subject to a more stringent standard than it had any reason to anticipate from Johnson's pleadings, the Court of Appeals' initial decision, or even the Court of Appeals' decision below. In such circumstances, California should be allowed to present evidence of narrow tailoring, evidence it was never obligated to present in either appearance before the District Court. See *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003, 1031–1032 (1992) (remanding for consideration under the correct legal standard); *id.,* at 1033 (KENNEDY, J., concurring in judgment) ("Although we establish a frame-

work for remand, . . . we do not decide the ultimate [constitutional] question [because] [t]he facts necessary to the determination have not been developed in the record").

\* \* \*

Petitioner Garrison Johnson challenges not permanent, but temporary, segregation of only a portion of California's prisons. Of the 17 years Johnson has been incarcerated, California has assigned him a cellmate of the same race for no more than a year (and probably more like four months); Johnson has had black cellmates during the other 16 years, but by his own choice. Nothing in the record demonstrates that if Johnson (or any other prisoner) requested to be housed with a person of a different race, it would be denied (though Johnson's gang affiliation with the Crips might stand in his way). Moreover, Johnson concedes that California's prisons are racially violent places, and that he lives in fear of being attacked because of his race. Perhaps on remand the CDC's policy will survive strict scrutiny, but in the event that it does not, Johnson may well have won a Pyrrhic victory.