**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GEORGE O. MITCHELL,
  *Plaintiff-Appellant*,

v.

STATE OF WASHINGTON; KELLY
CUNNINGHAM, SCC Superintendent;
DR. THOMAS BELL,
  *Defendants-Appellees*.

No. 13-36217

DC No.
3:12 cv-05403
BHS

OPINION

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted
April 6, 2015—Pasadena, California

Filed March 14, 2016

Before: Dorothy W. Nelson, A. Wallace Tashima,
and Richard R. Clifton, Circuit Judges.

Opinion by Judge Tashima;
Concurrence by Judge Clifton

## SUMMARY[*]

### Prisoner Civil Rights

The panel affirmed the district court's summary judgment in an action brought pursuant to 42 U.S.C. § 1983 in which plaintiff, who is civilly committed as a sexually violent predator, alleged that defendants' refusal to treat his Hepatitis C with interferon and ribavirin violated his right to reasonable medical care and that the consideration of race in the denial of this treatment violated the Equal Protection Clause.

The panel first held the district court erred by finding that the damages claims against the state defendants were barred by the Eleventh Amendment. The panel held that even though plaintiff testified in his deposition that he was suing defendants only in their official capacities, his amended complaint clearly stated that he was suing defendants in both their official and personal capacities for damages and injunctive relief and the record demonstrated that plaintiff, acting pro se, did not understand the legal significance of bringing claims against defendants in their official versus personal capacities.

The panel held that plaintiff's claims for injunctive and declaratory relief were moot because he received the requested treatment. The panel next found that plaintiff had failed to show any evidence that defendants' decision not to administer interferon and ribavirin was unreasonable and failed to meet the appropriate standard of care.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Addressing plaintiff's equal protection claim, the panel held that plaintiff set forth specific facts plausibly suggesting that defendant Dr. Bell employed an explicit racial classification sufficient to trigger strict scrutiny when he determined not to recommend plaintiff for interferon and ribavirin treatment. The panel held that Dr. Bell failed to meet his burden under the strict scrutiny because he failed to offer *any* compelling justification for the racial classification, let alone a justification that was narrowly tailored; instead, arguing only that plaintiff's equal protection claim failed because race was not the "primary" consideration in denying treatment. The panel nevertheless held that Dr. Bell was entitled to qualified immunity because it was not clearly established that a reasonable official would understand that the use of race-related success-of-treatment data as a factor in a medical treatment decision would be unconstitutional.

Concurring in part and concurring in the judgment, Judge Clifton agreed with most of the specific conclusions of the majority opinion, including that the claims were not barred by the Eleventh Amendment, that the claims for injunctive and declaratory relief were moot, and that Dr. Bell was entitled to qualified immunity. Judge Clifton would not take up the question of whether the Constitution forbids a doctor from considering credible scientific evidence that individuals of a certain race respond poorly to a particular treatment. Nevertheless if required to do so, he would conclude that, under the circumstance, plaintiff's rights were not violated.

**COUNSEL**

Erwin Chemerinsky, Peter Afrasiabi, Kathryn Marie Davis, Appellate Litigation Clinic, University of California, Irvine School of Law; Tommy Du (argued), Catriona Lavery (argued), Law Students, Irvine, California, for Plaintiff-Appellant.

Robert W. Ferguson, Attorney General of Washington, Grace C.S. O'Connor (argued) and Christopher Lanese, Assistant Attorneys General, Olympia, Washington, for Defendants-Appellees.

**OPINION**

TASHIMA, Circuit Judge:

Plaintiff-Appellant George Mitchell brought this action against Defendants-Appellees ("Defendants") for injunctive relief and damages under 42 U.S.C. § 1983, alleging constitutionally inadequate medical care and a violation of the Equal Protection Clause. The district court granted summary judgment in favor of Defendants, and Mitchell timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

**I.**

**BACKGROUND**

George Mitchell, a fifty-nine year old African-American male, has been civilly committed as a sexually violent predator to the Special Commitment Center ("SCC") by the

State of Washington since June 27, 2003. *See In re Det. of Mitchell*, 249 P.3d 662 (Wash. Ct. App. 2011).

On approximately December 14, 2000, prior to his arrival at the SCC, Mitchell was diagnosed with Hepatitis C. From approximately 2003 to 2005, Mitchell met with one of SCC's consulting physicians, Dr. W. Michael Priebe, of the Tacoma Disease Center. As a consulting specialist, Dr. Priebe was limited to recommending certain courses of treatment, and did not have the authority to order treatment. In mid-2005, Dr. Priebe discussed treatment options with Mitchell. One of the treatment options discussed was the administration of interferon and ribavirin. Because interferon and ribavirin are weight-based medications (meaning dosage depends on the patient's weight), Mitchell agreed to postpone this type of treatment until he could lose weight.

In May of 2009, Mitchell met with Dr. Thomas Bell, then the Medical Supervisor of SCC, to discuss his liver biopsy results and review treatment options. During that meeting, based on a belief that his condition was deteriorating, Mitchell requested interferon and ribavirin treatment. Dr. Bell informed Mitchell that the interferon and ribavirin treatment for his genotype had been largely unsuccessful on African-American males. In addition, after reviewing Mitchell's liver biopsy results, Dr. Bell told Mitchell that his Hepatitis C had not progressed to a level that would justify the harsh side effects of the requested treatment. Based on these factors, Dr. Bell did not recommend Mitchell for interferon and ribavirin treatment. In November of 2012, Mitchell was placed on interferon and ribavirin. The treatment was ultimately unsuccessful.

Mitchell commenced this action on August 23, 2012, against Defendants Dr. Bell, Kelly Cunningham, Superintendent of SCC, and the State of Washington.[1] Mitchell sued Dr. Bell and Cunningham in their individual and official capacities. Mitchell alleged that Dr. Bell's refusal to refer him for interferon and ribavirin treatment violated the Fourteenth Amendment for two reasons:[2] (1) the denial of interferon and ribavirin treatment violated his right to reasonable medical care; and (2) the consideration of race in the denial of treatment violated the Equal Protection Clause.

On referral of this case for a report and recommendation ("R&R"), the Magistrate Judge recommended that Defendants' motion for summary judgment be granted. The Magistrate Judge first ruled that all claims against the State of Washington were barred by the Eleventh Amendment. Second, she ruled that because Mitchell testified in his deposition that is he suing Cunningham and Dr. Bell in their official capacities, all claims for damages against them are barred by the Eleventh Amendment. The Magistrate Judge then excluded a declaration proffered by Mitchell because it was unsigned and because the declarant lacked sufficient qualifications and personal knowledge. She next ruled that Defendants are entitled to qualified immunity because Mitchell failed to assert a constitutional violation.

---

[1] Mitchell also sued Randall Griffith, Paul Temposky, and Christine Haueter. These individuals are no longer defendants in this action.

[2] Mitchell also alleged that the decision not to authorize his requested Hepatitis C diet violated the Fourteenth Amendment. The district court granted summary judgment in favor of Defendants on this claim and Mitchell has not appealed this issue.

Specifically, the Magistrate Judge ruled that Mitchell presented no evidence that Dr. Bell's treatment of Mitchell did not meet the appropriate standard of care for a medical provider, and that Mitchell's equal protection claim failed because he had not shown that Defendants acted with the intent or purpose to discriminate.

The District Court adopted the Magistrate Judge's R&R and entered judgment against Mitchell.

## II.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 639 (9th Cir. 2003). The Court must "determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc) (citing *Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc)).

## III.

## DISCUSSION

## A. Eleventh Amendment Immunity

The Eleventh Amendment bars claims for damages against a state official acting in his or her official capacity. *Pena v. Gardner*, 976 F.2d 469, 472 (9th Cir. 1992) (per curiam). It does not, however, bar claims for damages

against state officials in their *personal* capacities. *Id.* Moreover, when a plaintiff sues a defendant for damages, there is a presumption that he is seeking damages against the defendant in his personal capacity. *Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999).

Mitchell's First Amended Complaint clearly states that he is suing Cunningham and Dr. Bell in both their official and personal capacities for damages and injunctive relief. The district court, however, relying on Mitchell's deposition testimony that he is suing Cunningham and Dr. Bell *only* in their official capacities, held that all claims for damages against Cunningham and Dr. Bell should be dismissed. But the record clearly demonstrates that Mitchell, who was acting *pro se*, did not understand the legal significance between bringing claims against Dr. Bell and Cunningham in their official versus personal capacities. Further, in questioning Mitchell, Defendants' attorney failed adequately to explain the significance of the difference, even after Mitchell signified that he did not understand the legal jargon and would need assistance. As a result, we conclude that Mitchell is not bound by his deposition testimony and Mitchell's damages claims against Defendants in their individual capacities are not barred by the Eleventh Amendment.**[3]** To hold otherwise would "threaten[] to ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009).

---

**[3]** Mitchell does not contest the district court's holding that all claims against the State of Washington are barred by the Eleventh Amendment.

**B. Mootness**

Although not briefed by the parties, before reaching the merits of Mitchell's claims, we must consider whether Mitchell's claims for injunctive and declaratory relief are moot. *See Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1128–29 (9th Cir. 2005) (stating that because mootness is a jurisdictional issue it should be raised *sua sponte*). Article III of the Constitution requires that "federal courts confine themselves to deciding actual cases and controversies." *Id.* at 1128. "'[I]t is not enough that there may have been a live case or controversy when the case was decided by the court whose judgment we are reviewing.' Rather, Article III requires that a live controversy persist throughout all stages of the litigation." *Id.* at 1128–29 (quoting *Burke v. Barnes*, 479 U.S. 361, 363 (1987) (citation omitted)).

When a plaintiff no longer wishes to engage in the activity for which he initially sought declaratory or injunctive relief, the requisite case or controversy is absent. *Id.* at 1129. Several months after Mitchell commenced this action, SCC began treating Mitchell with interferon and ribavirin. The treatment was ineffective. Given the failure of the requested treatment, Mitchell no longer has any need for the treatment and there is no reasonable expectation that Mitchell will request the same failed treatment again. As a result, we conclude that Mitchell's claims for injunctive and declaratory relief are moot.

## C. Damages under 42 U.S.C. § 1983 and Qualified Immunity

Mitchell's remaining claims are claims for damages under 42 U.S.C. § 1983 against individual Defendants, Dr. Bell and Cunningham, in their personal capacities. Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, in determining whether qualified immunity applies to Defendants, we must determine whether: (1) the facts adduced constitute the violation of a constitutional right; and (2) the constitutional right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Mitchell asserts two constitutional violations. First, he contends that Dr. Bell and Cunningham denied him constitutionally adequate medical care in violation of the Fourteenth Amendment. Second, he contends that Dr. Bell and Cunningham violated his right to equal protection under the Fourteenth Amendment by making a medical treatment decision based on race.

### 1. Constitutionally Adequate Medical Care Under the Fourteenth Amendment

"Involuntarily committed patients in state mental health hospitals have a Fourteenth Amendment due process right to be provided safe conditions by the hospital administrators . . . . [W]hether a hospital administrator has violated a patient's constitutional rights is determined by whether the administrator's conduct diverges from that of a reasonable

professional." *Ammons v. Wash. Dep't. of Soc. & Health Servs.*, 648 F.3d 1020, 1027 (9th Cir. 2011). In other words, a decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). This standard has been referred to as the "*Youngberg* professional judgment standard." *Ammons*, 648 F.3d at 1027. The *Youngberg* standard differs from the "deliberate indifference" standard used in Eighth Amendment cruel and unusual punishment cases, in that "[p]ersons who have been involuntarily committed are entitled to *more considerate treatment and conditions of confinement* than criminals whose conditions of confinement are designed to punish." *Id*. (quoting *Youngberg*, 457 U.S. at 321–22) (internal quotation marks omitted).

Mitchell argues that Dr. Bell's decision not to administer interferon and ribavirin treatment violates the *Youngberg* professional judgment standard. In support of this argument, Mitchell presents several excerpts from medical texts suggesting that administration of interferon and ribavirin is the preferred treatment course for Hepatitis C. These documents, however, contain guidelines and recommendations, rather than specific standards of care. None of the documents submitted by Mitchell suggests that Dr. Bell's treatment decision, based on the individualized circumstances of Mitchell's health, was unreasonable. Furthermore, the fact that Dr. Priebe suggested, in 2005, that *future* interferon and ribavirin treatment may be appropriate is not sufficient to demonstrate that Dr. Bell's decision concluding otherwise in 2009 was unreasonable. As a result,

we conclude that Mitchell has failed to present evidence sufficient to rebut the *Youngsberg* professional judgment standard. Consequently, we affirm the district court's grant of summary judgment in favor of Defendants on this claim.

## 2. Equal Protection

"[A]ny official action that treats a person differently on account of his race or ethnic origin is inherently suspect." *Fisher v. Univ. of Tex.*, 133 S.Ct. 2411, 2419 (2013) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 523 (1980) (Stewart, J., dissenting) (internal quotation marks omitted)). Consequently, the general rule is that when a state actor explicitly treats an individual differently on the basis of race, strict scrutiny is applied. *Id*.; *Johnson v. California*, 543 U.S. 499, 505 (2005); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Under strict scrutiny, all racial classifications imposed by the government must be "narrowly tailored to further compelling government interests." *Fisher*, 133 S.Ct. at 2419 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (internal quotation marks omitted)).

The Supreme Court has never considered whether strict scrutiny applies to the use of race by a state actor in making a medical treatment decision.[4] Nor have we. First, we note that the Supreme Court has "insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications, such as race-conscious university admissions policies, race-based preferences in government contracts, and

---

[4] Although the Supreme Court has never directly addressed this issue, members of the Court have in the past indicated that they believe strict scrutiny should apply to race-targeted medical outreach programs. *See Bush v. Vera*, 517 U.S. 952, 984 (1996).

race-based districting intended to improve minority representation." *Johnson*, 543 U.S. at 505 (citations omitted). The question is whether these reasons for applying strict scrutiny should be applied in the medical context. We conclude that they should because even medical and scientific decisions are not immune from invidious and illegitimate race-based motivations and purposes. Indeed, the lens under which we examine the constitutionality of race-based medical and scientific decisions becomes especially critical in light of documented instances in which the federal government has pursued reprehensible race-based actions in the name of science and medicine. *See, e.g., U.S. Public Health Service Syphilis Study at Tuskegee*, CENTERS FOR DISEASE CONTROL AND PREVENTION, www.cdc.gov/tuskegee/index.html (last visited July 22, 2015) (describing the government's role in the Tuskegee syphilis study withholding adequate treatment from poor black men); *Secret World War II Chemical Experiments Tested Troops Based on Race*, NPR, www.npr.org/2015/06/22/415194765/u-s-troops-tested-by-race-in-secret-world-war-ii-chemical-experiments (last visited July 22, 2015) (describing government funded program studying the effects of mustard gas and other chemical agents on African-American, Japanese-American, and Puerto Rican soldiers during World War II).

We also recognize that there are likely numerous instances where the use of race as a factor in a medical decision is benign and may even be beneficial. However, "there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Shaw v. Reno*, 509 U.S. 630, 642–43 (1993) (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (internal quotation marks omitted)). Indeed,

"[t]he point of carefully examining the interest asserted by the government in support of a racial classification, and the evidence offered to show that the classification is needed, is precisely to distinguish legitimate from illegitimate uses of race in governmental decisionmaking." *Adarand*, 515 U.S. at 228. As a result, courts apply strict scrutiny "in order to 'smoke out' illegitimate uses of race by assuring that [government] is pursuing a goal important enough to warrant [such] a highly suspect tool." *Johnson*, 543 U.S. at 506 (quoting *J.A. Croson Co.*, 488 U.S. at 493).

Turning to the facts of this case, we conclude that Mitchell has set forth specific facts plausibly suggesting that Dr. Bell[5] employed an explicit racial classification sufficient to trigger strict scrutiny. Mitchell states that when he requested interferon and ribavirin treatment from Dr. Bell he was told that treatment did not work on African Americans. Dr. Szeibert's declaration corroborates this allegation, stating that "Dr. Bell rejected Mitchell's request [for interferon and ribavirin treatment], explaining to Mr. Mitchell that interferon & ribavirin treatments for plaintiff's Hepatitis C genotype . . . had been largely unsuccessful on African American males . . . ." Indeed, on appeal, Defendants concede that race was a factor in Dr. Bell's decision to deny Mitchell's medication request. Accepting these facts as true, as we must on summary judgment, under strict scrutiny, Mitchell has adduced sufficient facts to establish that Dr. Bell employed a racial classification when he determined not to recommend Mitchell for interferon and ribavirin treatment.

---

[5] Because Mitchell has alleged no facts suggesting that Cunningham knew of the potential equal protection violations, we affirm the grant of summary judgment for this claim as to Cunningham. As a result, the remainder of our analysis focuses solely on the claim against Dr. Bell.

Defendants suggest that strict scrutiny should not apply for two reasons: (1) Dr. Bell's consideration of the race-related success rate of interferon and ribavirin treatment "is not synonymous with a distinction based solely on race," because there may be a different genotype of the disease that would be responsive to treatment in the African-American male population; (2) race-related success of the treatment was not the only factor considered by Dr. Bell, and thus was not necessarily determinative of the treatment decision. Under strict scrutiny, these arguments are unavailing. First, the fact that race is a *factor* in a government decision is sufficient to trigger strict scrutiny. *See Fisher*, 133 S.Ct. at 2419. As a result, the hypothetical presented by Defendants suggesting that *if* Mitchell had a different genotype of Hepatitis C, race may not have factored into the decision, is irrelevant. Second, because Mitchell has shown that Dr. Bell explicitly factored Mitchell's race into his treatment decision, it was not necessary to show that "but for" Dr. Bell's consideration of race, the decision to withhold the requested drugs would have occurred. "When the government expressly classifies persons on the bases of race or national origin . . . its action is 'immediately suspect' . . . . A plaintiff in such a lawsuit need not make an extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict scrutiny." *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204–05 (2d Cir. 2006); *see also Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004) (stating that the plaintiff was not required to show discriminatory intent because the state admitted it considered race when it assigned inmates to a cell).

Because we hold that strict scrutiny applies, Dr. Bell is required to demonstrate that the use of race in his medical decision was narrowly tailored to achieve a compelling

government interest. *Adarand*, 515 U.S. at 227. It is not difficult to imagine the existence of a compelling justification in the context of medical treatment. *See* Erik Lillquist & Charles A. Sullivan, *The Law and Genetics of Racial Profiling in Medicine*, 39 HARV. C.R.-C.L.L. REV. 391, 445 (2004) (suggesting that sufficient empirical data to treat African-Americans differently than whites may constitute a compelling government interest); Scarlett S. Lin & Jennifer L. Kelsey, *Use of Race and Ethnicity in Epidemiologic Research: Concepts, Methodological Issues, and Suggestions for Research*, 22 EPIDEMIOLOGIC REV. 187, 187 (2000) (emphasizing the importance of the use of race and ethnicity in medical research). Because, however, Dr. Bell failed to offer *any* compelling justification for the racial classification, let alone a justification that was narrowly tailored; instead, arguing only that Mitchell's equal protection claim fails because race was not the "primary" consideration in denying treatment, Dr. Bell failed to meet his burden under the strict scrutiny standard. Thus, the district court erred in concluding that no constitutional violation occurred. *See Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 981 (9th Cir. 2006); *Krislov v. Rednour*, 226 F.3d 851, 866 n.7 (7th Cir. 2000).[6]

---

[6] The concurring opinion agrees that strict scrutiny should be applied, Concur. Op. at 24, but argues that this standard was met because "Dr. Bell successfully articulated a compelling State interest in the health of his patient when he explained that he refused to prescribe treatment because he thought it would do more harm than good." *Id.* at 27. While this may be sufficient as a Hippocratic oath-like aspirational goal, it simply does not pass muster as a sufficiently particularized showing under the strict scrutiny standard.

### 3.  Qualified Immunity – Clearly Established

Despite the fact that we hold that the violation of a constitutional right occurred, Dr. Bell is entitled to qualified immunity if it was not "clearly established" that his actions would violate Mitchell's constitutional rights. [7] *Pearson*, 555 U.S. at 232.  At the time of Dr. Bell's actions, it was clear that the Fourteenth Amendment requires all racial classifications to survive strict scrutiny. *Smith v. Univ. of Wash., Law School*, 233 F.3d 1188, 1196–97 (9th Cir. 2000); *Rudebusch v. Hughes*, 313 F.3d 506, 518 (9th Cir. 2002). Furthermore, the right of a ward of the state to be free from racial discrimination was clearly established.  *Johnson*, 543 U.S. at 512.

However, "[i]t is insufficient that the broad principle underlying a right is well-established." *Walker*, 370 F.3d at 978.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (internal quotation marks omitted)).

---

[7] The concurring opinion notes that, under *Pearson*, "we are not required to consider the question of" a constitutional violation.  Concur. Op. at 20. But *Pearson* clearly authorized us to address either inquiry first.  *See Pearson*, 555 U.S. at 236 ("[W]e conclude that, while the sequence set forth [in *Saucier v. Katz*, 533 U.S. 194 (2001)] is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").  We first address the constitutional violation question for clarity, particularly because the district court addressed it and held that there was no constitutional violation.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks omitted)); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). Mitchell "has not brought to our attention, and our independent research does not reveal, case law involving the particular circumstances presented by this case." *Walker*, 370 F.3d at 977–78. Here, the "particular circumstances" are the use of race-related success-of-treatment data as a factor in making a medical treatment decision. As a result, it was not clearly established that a reasonable official would understand that the use of race-related success-of-treatment data as a factor in a medical treatment decision would be unconstitutional. Dr. Bell is therefore entitled to qualified immunity.

## IV.

## CONCLUSION

For the reasons set forth above, the district court's grant of summary judgment in favor of Defendants is **AFFIRMED.**

CLIFTON, Circuit Judge, concurring in part and concurring in the judgment:

One of the primary teachings of the Hippocratic School is embodied in the maxim "first do no harm." The phrase serves as a guiding principle for physicians who are debating the use of an intervention that carries an obvious risk of harm but a less certain chance of benefit. In this case, Dr. Thomas Bell refused to prescribe a course of interferon and ribavirin therapy to treat George Mitchell's Hepatitis C because he determined that the treatment was more likely to harm Mitchell than cure him. The primary basis for Dr. Bell's treatment decision was that the progression of Mitchell's Hepatitis C had not advanced to the point where the toxicities of the treatment were justified. But Dr. Bell also considered that, because of Mitchell's race, he was far less likely to be cured.

This court has never addressed whether the Constitution forbids a doctor from considering credible scientific evidence that individuals of a certain race respond poorly to a particular treatment. Nor have we addressed what standard of scrutiny would be used to evaluate such a claim. We do not need to address those questions in order to resolve this case, and I would not do so.

I agree with the conclusions of the majority opinion that the Eleventh Amendment does not bar Mitchell's claim for damages against the Defendants in their individual capacities, that his claims for injunctive and declaratory relief are moot, and that the summary judgment dismissing his claims for damages against Kelly Cunningham was appropriate and should be affirmed. I join the portions of the majority opinion that state and explain those conclusions. I also agree

that Dr. Bell is entitled to qualified immunity on the claim for damages against him and join the portion of the majority opinion that affirms the summary judgment in his favor. That is enough to conclude the case.

The majority opinion goes on to discuss the question of whether Dr. Bell violated Mitchell's constitutional rights and concludes that on that question summary judgment was not appropriate. It is that portion of the case that raises the difficult issues identified above. The Supreme Court has made clear that we are not required to consider the question of whether there has been a violation of plaintiff's constitutional rights if the case can be resolved, as this one has been, on the ground that the constitutional right at issue was not clearly established at the time. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Taking up that question, as the majority opinion does, I ultimately agree with the majority's determination that strict scrutiny should be applied in these circumstances, though not without some hesitation. I would, however, hold that Dr. Bell's limited consideration of Mitchell's race was narrowly tailored to further the State's compelling interest in preserving the health of the patient committed to its custody, and thus, I would conclude that Mitchell's constitutional rights were not violated. I acknowledge that the argument presented by the Defendants' counsel devoted little attention to that issue. The majority opinion supports its conclusion with the observation, at 16, that Dr. Bell failed to offer any compelling or narrowly tailored justification for the racial classification at issue here, and that is an accurate assessment. The justification for the treatment is apparent, however, and our failure to recognize it may do mischief when a similar case arises in the future. The strict scrutiny standard

intentionally sets a very high bar, and the majority opinion may leave the impression that medical judgment does not provide sufficient justification.

Because insufficient attention has been given to this issue by the parties, I would prefer that we resolve this case without getting into the issue of whether Mitchell's constitutional right was violated.  We should follow the example of the physicians' maxim – do no harm – by leaving that question for another day.  As the majority has elected to address that question, though, I must note my disagreement with its conclusion that Dr. Bell's treatment was not sufficiently justified.

## I.  Background

### A.  Hepatitis C Treatment Standards

Hepatitis C is a viral liver disease with effects that range in severity from short-term illness to cirrhosis and liver cancer.  "Until recently, hepatitis C treatment was based on therapy with interferon and ribavirin, which required weekly injections for 48 weeks."  *See* World Health Organization, *Hepatitis C* (2015).[1]   However, the treatment "caused frequent and sometimes life-threatening adverse reactions" that deterred many patients from completing therapy.  *Id.*

Despite these rigors, it "is well known that many patients will not be cured by the treatment, and that patients of European ancestry have a significantly higher probability of being cured than patients of African ancestry."  Dongliang Ge, et al., *Genetic Variation in IL28B Predicts Hepatitis C*

---

[1] http://who.int/mediacentre/factsheets/fs164/en.

*Treatment-Induced Viral Clearance*, 461 Nature 399 (2009). Part of the reason for the divergence is that African Americans are much less likely to inherit a polymorphism near the IL28B gene that helps the liver eliminate the Hepatitis C virus. *See id.* As a result, physicians must consider this ethnic disparity to accurately assess the potential efficacy of the treatment in African American patients.

The standard of care for determining whether to prescribe interferon and ribavirin is individualized and multi-factoral. It requires balancing "(1) the severity of liver disease, (2) the potential of serious side effects, (3) the likelihood of treatment response, and (4) the presence of comorbid conditions." *See* Doris B. Strader, et al., *Diagnosis, Management, and Treatment of Hepatitis C*, 39 Hepatology 1147, 1155 (2004) (numbering added). With respect to the severity of the disease, "treatment is indicated in those with more-than-portal fibrosis," which means that liver damage has progressed to a moderate grade. *Id.* The likelihood of a treatment response is indicated by the genotype of Hepatitis C that the patient has been infected with and the patient's viral load. *Id.* at 1153 (stating that individuals with Hepatitis C genotype 1 and individuals with high viral loads are substantially less likely to achieve a sustained virologic response). In addition, weight influences outcomes because heavier individuals require higher dosages of medicine, and thus, are more likely to experience prohibitive side effects. Finally, race is a significant predictor of success, and it complicates treatment decisions for African Americans because the high toxicities of the treatment must be weighed against a more fractional chance of a sustained virologic response.

### B.  Mitchell's Treatment History

Mitchell is a sexually violent predator who resides at a special commitment center in Washington.  He was first diagnosed with Hepatitis C two years prior to his civil commitment. In 2005, Mitchell consulted Dr. Michael Priebe regarding Hepatitis C treatment options, including interferon and ribavirin therapy.  Mitchell understood that the treatment was weight based, and agreed to postpone treatment until he could lose weight.

In 2009, Mitchell met with Dr. Bell and requested a referral for interferon and ribavirin therapy because he believed that he had lost the weight necessary to begin treatment.  Mitchell also explained that he had recently remarried and that he did not want to infect his wife.  Dr. Bell informed Mitchell that he only had a fractional chance of achieving a remission-like state from the treatment because of his genotype of Hepatitis C and because of his African ancestry.  Dr. Bell further explained that even if the treatment were successful, Mitchell would still have Hepatitis C and could still infect his wife.  Dr. Bell then reviewed Mitchell's most recent liver biopsy, which showed minimal fibrotic advancement.  He concluded that Mitchell's "Hepatitis C had not progressed to a level that would justify the physically demanding side effects" of the treatment, and refused to refer Mitchell for treatment.

Sometime thereafter, in 2012, Mitchell was placed on interferon and ribavirin therapy.  As the majority opinion notes, at 5, that treatment was unsuccessful.  Mitchell responded poorly and did not achieve a sustained virologic response.

## II. Discussion

### A. The Strict Scrutiny Standard

The Supreme Court has held that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 236 (1995) (internal quotation marks and citation omitted). That is "[b]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic." *Id*.

We have never previously applied strict scrutiny to the medical treatment decisions of prison doctors. Though racial classifications based on race "seldom" provide a relevant basis for disparate treatment, "seldom" does not mean "never." It seems to me indisputable, based on the scientific evidence referenced above, that medicine is a place where the "seldom" sometimes occurs. Our history is scarred with reprehensible race-based actions, including the medical and scientific decisions referred to in the majority opinion, at 13, and I condemn those actions, but I do not see how the medical decision in this case can fairly be analogized to those. Treatment was not withheld from those victims based on a professional judgment, based on medical science, that the treatment would do more harm than good.

Nonetheless, the Supreme Court has "insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications." *See Johnson v. California*, 543 U.S. 499, 505 (2005). Someday the Court may encounter a case where medical science presents the "seldom" situation and have the

opportunity to consider whether strict scrutiny should apply in that circumstance.  Unless and until it does, I agree with the majority opinion that the strict scrutiny standard applies here.

A decision to apply the strict scrutiny standard is sometimes viewed as the end of the case because the bar is set too high to surmount, but that is not how the doctrine is supposed to be applied.  "Strict scrutiny is not strict in theory, but fatal in fact."  *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (internal quotation marks and citation omitted). Indeed, its application "says nothing about the ultimate validity of any particular law; that determination is the job of the court applying strict scrutiny."  *Adarand*, 515 U.S. at 230.

The strict scrutiny standard is better understood as "a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context." *Grutter*, 539 U.S. at 327.  "Context matters when reviewing race-based governmental action under the Equal Protection Clause."  *Id.*  The "fundamental purpose" of strict scrutiny is to "take 'relevant differences' into account."  *Adarand*, 515 U.S. at 228.  "Prisons are dangerous places, and the special circumstances they present may justify racial classifications in some contexts."  *Johnson*, 543 U.S. at 515. The danger of prisons might not be a relevant factor here, but the institutional setting might be.  In the nuanced context of correctional medicine, the court must perform a searching and careful analysis that takes the relevant differences into account.

*B.  Defendants' Compelling Interest*

"[I]n some situations a State's interest in facilitating the health care of its citizens is sufficiently compelling to support the use of a suspect classification." *Regents of the University of California, v. Bakke*, 438 U.S. 265, 310 (1978); *see also Roe v. Wade*, 410 U.S. 113, 154 (1973) (stating that a State may have compelling interests "in safeguarding health, [and] in maintaining medical standards"). Indeed, individual health and well-being have been recognized as a compelling governmental interest in a variety of contexts, including prisons. *See, e.g.*, *Warsoldier v. Woodford*, 418 F.3d 989, 996–98 (9th Cir. 2005) (stating that prison officials have a compelling interest in preserving inmate health); *Goehring v. Brophy*, 94 F.3d 1294, 1300 (9th Cir. 1996) (holding that a "University's interest in the health and well-being of its students . . . is compelling").

This case implicates the State's compelling interest in safeguarding the health of a civilly committed individual. As Dr. Bell explained, he did not recommend Mitchell for interferon and ribavirin treatment because Mitchell's liver damage had not progressed to a level that would justify the physically demanding side effects of the treatment. Dr. Bell also noted that Mitchell had a fractional chance of achieving a remission-like state. To the extent that Dr. Bell considered Mitchell's race, it was only to inform his assessment of the likelihood of successful treatment. That narrow consideration was necessary to a fully informed treatment decision, and therefore, was necessary to further the State's compelling interest in preserving Mitchell's health.

This case also implicates the State's compelling interest in maintaining appropriate medical standards because, as

noted above, a fully informed assessment of the potential efficacy of interferon and ribavirin treatment requires the consideration of race. Maintaining medical standards is a compelling interest for physicians because they may be subject to professional and legal sanctions if they make substandard treatment decisions. It is equally compelling for the State, which has an obligation to retain quality physicians who are capable of providing adequate medical care. If state-employed doctors are required to deliver substandard care or to prescribe treatments that they believe are inappropriate, those doctors may either refuse to work for the State or be exposed to professional and legal liabilities. As a result, the State's interest in maintaining medical standards has a direct effect on its compelling interest in preserving inmate health.

The majority opinion holds, at 16, that Dr. Bell violated Mitchell's constitutional rights because he failed to offer any compelling justification for his statement that interferon and ribavirin treatment is less effective in African Americans. But this opinion is the first instance in which our court has applied strict scrutiny to the treating decision of a correctional physician. Given the novelty of this case, I believe that Dr. Bell successfully articulated a compelling State interest in the health of his patient when he explained that he refused to prescribe treatment because he thought it would do more harm than good. Mitchell presented no evidence that Dr. Bell acted based on any racial animus or with an intent to discriminate against Mitchell based on race. Dr. Bell's attorney might not have uttered the magic words "compelling state interest," but we know enough to conclude that Dr. Bell did not violate Mitchell's constitutional rights.

The majority opinion does not disagree with either Dr. Bell's explanation or my observation that there was no

evidence of racial animus. It simply states, at 16 n. 6, that Dr. Bell's explanation is not enough to satisfy the strict scrutiny standard. Why not? The majority opinion does not say. Applying that standard in a way that requires a doctor to do more harm than good violates more than "a Hippocratic oath-like aspirational goal." *Id*. It violates good sense.

### C. Dr. Bell's Consideration of Race was Narrowly Tailored

"When race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the 'narrow tailoring' test." *Adarand*, 515 U.S. at 237. "The purpose of the narrow tailoring requirement is to ensure that the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Grutter*, 539 U.S. at 333 (internal quotation marks and citation omitted). The court must carefully analyze "the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context." *Id*. at 327. In this case, Dr. Bell's consideration of race was narrowly tailored. In the words of *Grutter*, "there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id*. at 333.

As an initial matter, Dr. Bell's decision to deny Mitchell's treatment request was not made based on a general policy of excluding African Americans from interferon and ribavirin therapy. Rather, Dr. Bell performed an individualized and multi-factoral assessment of Mitchell's objective profile. *See Grutter*, 539 U.S. at 334 (holding that a race-sensitive admissions program was narrowly tailored because the

consideration of race was merely one factor in the decision-making process and individualized consideration was given to each applicant). Dr. Bell considered that Mitchell had a strain of Hepatitis C that was less likely to respond to interferon and ribavirin by nearly a 2:1 ratio. Dr. Bell also gave great weight to Mitchell's most recent liver biopsy, which showed minimal fibrotic advancement. Dr. Bell did explain to Mitchell that his African ancestry reduced his chance of achieving a sustained virologic response, but he did not refuse to prescribe treatment on that basis. Rather, Dr. Bell indicated that if Mitchell's liver condition had been worse, he would have recommended Mitchell for treatment. Mitchell acknowledged that other African American inmates with his genotype of Hepatitis C were receiving interferon and ribavirin therapy, which suggests that treatment decisions were typically made on an individualized basis. In sum, nothing in the record suggests that Dr. Bell's decision was based on invidious discrimination or illegitimate motive. And, with the benefit of hindsight, we now know that Dr. Bell's professional judgment was correct – when Mitchell received the treatment he sought, it was unsuccessful.

The narrowness of Dr. Bell's decision is further demonstrated by how closely it adheres to the standard of care used to evaluate a patient for potential interferon and ribavirin therapy. As noted above, at 22, physicians are supposed to balance the severity of liver disease, the potential of serious side effects, the likelihood of treatment response, and the presence of comorbid conditions. That is exactly what Dr. Bell did. Dr. Bell's consideration of race was based on credible, peer-reviewed studies, and it helped him make a fully informed assessment of "the likelihood of a treatment response." Strader, *supra*, at 1155. Indeed, had Dr. Bell failed to consider Mitchell's race, his medical assessment

would have been under-informed and would have fallen below an acceptable standard of care.

The relevant standard of care is a unique characteristic of the medical context that must be taken into account for purposes of narrow tailoring. *See Grutter*, 539 U.S. at 327 ("Context matters when reviewing race-based governmental action."). Physicians are constrained by professional and legal regimes that require them to meet or exceed the relevant standard of care, and they may suffer significant sanctions if they do not. *See Pickup v. Brown*, 740 F.3d 1208, 1228 (9th Cir. 2013) ("[D]octors are routinely held liable for giving negligent medical advice to their patients, without serious suggestion that the First Amendment protects their right to give advice that is not consistent with the accepted standard of care."). The Equal Protection Clause should not be interpreted in a manner that compels or motivates a physician to prescribe a course of treatment that he or she believes is not medically warranted. In this instance, Dr. Bell's compliance with a scientifically justified standard of care was a narrowly tailored means of making an informed treatment decision regarding an individual whose health had become the state's responsibility.

The institutional context presents additional challenges that must also be taken into account. Most significantly, the prevalence of Hepatitis C infection in prison is far higher than it is in the general population, and approximately 30% of individuals with Hepatitis C pass through the correctional system in a given year. *See* Kara Chew, et al., *Treatment Outcomes with Pegylated Interferon and Ribavirin for Male Prisoners with Chronic Hepatitis C*, 43 J. Clinical Gastroenterology 686 (2009). The high rate of Hepatitis C coupled with the astronomical cost of therapy has forced state

institutions to prioritize treating those individuals whose condition has advanced to the point of medical necessity. *See* Lara Strick, *Treatment of Hepatitis C in a Correctional Setting*, Hepatitis C Online (Dec. 11, 2015). As a result, physicians in those institutions must respond to the challenge of dealing with inmates who want to be treated but fail to meet the guidelines. Adhering to guidelines that prioritize treatment for individuals with significant disease progression is a narrowly tailored way to meet that challenge. *Cf. Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc) (stating that it is appropriate to consider the resources available to a prison official who lacks authority over budgeting decisions when determining whether the official is liable for money damages for deliberate indifference to the serious medical needs of a prisoner).

The majority opinion disputes none of this, yet nonetheless concludes that Dr. Bell violated Mitchell's constitutional rights. *Grutter* instructs us to "carefully examin[e] the importance and the sincerity of the reasons" for considering race in making a decision. *Grutter*, 539 U.S. at 327. The majority opinion does not. Its conclusion – that Dr. Bell's exercise of professional judgment based on scientific evidence, without racial animus, nonetheless constituted racial discrimination in violation of the Constitution – is both inconsistent with precedent and detached from reality.

## D. Implications of the Majority Opinion

I fear that the majority opinion creates significant uncertainty regarding the extent to which doctors can consider ethnic and racial differences in making judgments as to medical treatment. Is a doctor who is treating an institutionalized African American patient with Hepatitis C

genotype 1 required to pretend that the likelihood of success with interferon and ribavirin therapy is a race-blind 50 percent if in actuality it is only 20 percent?

The majority opinion also creates uncertainty regarding the extent to which doctors may adhere to recommended medication dosages that vary based on race. For example, ethnic differences in cardiovascular drug response require physicians to base their dosage determinations on race to minimize dangerous side effects. *See*, *e.g*, Julie Johnson, *Ethnic Differences in Cardiovascular Drug Response*, 118 Circulation 1383 (2008). Are cardiologists supposed to prescribe dosages in a race-blind manner and at potential risk to their patients?

Doctors are put in an unenviable position if they must ignore critical "risk of harm" information when treating their patients. We should not require a physician "to perform a prefrontal lobotomy on himself." *Fleming Sales Co., Inc. v. Bailey*, 611 F.Supp. 507, 514 (D. Ill. 1985).

## III.    Conclusion

I concur in the judgment affirming the district court's summary judgment in favor of Defendants. I agree with the specific conclusions of the majority opinion that the Eleventh Amendment does not bar Mitchell's claim for damages against the Defendants in their individual capacities, that his claims for injunctive and declaratory relief are moot, that the summary judgment dismissing his claims for damages against Kelly Cunningham was appropriate, and that Dr. Bell is entitled to qualified immunity on the claim for damages against him. I would not take up the question of whether Mitchell's constitutional rights were violated, but if required

to do so, conclude that they were not.  I thus concur in part with the majority opinion and concur in full with its judgment.